IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-20563
_____


RICHARD GERRY DRINKARD,

Petitioner-Appellant,

versus

GARY L. JOHNSON, Director, Texas
Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.
_____

Appeal from the United States District Court for the
Southern District of Texas
_____

October 7, 1996

Before JOLLY, WIENER, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Richard Gerry Drinkard, a Texas death row inmate, seeks a certificate of probable cause ("CPC") to appeal the district court's denial of his petition for a writ of habeas corpus. Construing his application for CPC as an application for a certificate of appealability ("COA") under 28 U.S.C. § 2253, as amended by section 102 of the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), we grant the COA because Drinkard has made a substantial showing of the denial of a constitutional right.

Turning to the merits of his appeal, the central issue we decide today is whether a special instruction addressing temporary

insanity caused by intoxication, which was given during the sentencing phase of Drinkard's trial under section 8.04(b) of the Texas Penal Code, unconstitutionally prevented the jury from considering mitigating evidence of intoxication that did not rise to the level of temporary insanity.  Based on our review of Drinkard's appeal, we conclude that the special instruction did not have such an effect.  Alternatively, and in view of the cogent dissent of Judge Garza, we are compelled to address the question whether 28 U.S.C. § 2254(d)(1), as amended by section 104(3) of the AEDPA, applies to our review of Drinkard's appeal.  Holding that the AEDPA does apply, we conclude that it bars relief because the state court's decision on Drinkard's claim was neither "contrary to, [n]or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  AEDPA, § 104(3) (to be codified at 28 U.S.C. § 2254(d)(1)).  We therefore affirm the district court's denial of Drinkard's habeas petition.

I

A Texas jury convicted Drinkard of capital murder in the deaths of Louann Anthony, Ladeen Hendrix, and Jerry Mullins.[1] Evidence of Drinkard's intoxication at the time of the murders was presented at both the guilt and the sentencing phases of his trial.

---

[1]The three victims were murdered in Ms. Anthony's home.  All three victims received circular head wounds, consistent with wounds inflicted by the head of a carpenter's hammer.  In addition, Anthony was stabbed three times in the chest; Hendrix was stabbed several times in the back and abdomen; and Mullins was stabbed fifteen times in the back.

At the close of the sentencing phase, the trial court submitted two special issues to the jury.[2] The trial court gave the following general instruction concerning the two statutory special issues:

> [I]n determining each of these Special Issues, you may take into consideration all of the evidence submitted to you in the full trial of the case, that is, all of the evidence submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and all of the evidence, if any, admitted before you in the second part of the trial wherein you are called upon to determine the answers to Special Issues hereby submitted to you.

Over Drinkard's objection, the trial court also gave the following special instruction after the general instruction:

> Evidence of temporary insanity caused by intoxication may be introduced by the defendant in mitigation of the penalty attached to the offense for which he is being tried. Intoxication means disturbance of mental or physical capacity resulting from the introduction of any substance into the body. Temporary insanity caused by intoxication means that the defendant's mental capacity was so disturbed from the introduction of the substance into the body that the defendant did not know that his conduct was wrong. Therefore, if you find that the defendant at the time of the commission of the offense

---

[2]At the time of Drinkard's trial, the Texas Code of Criminal Procedure required the submission of the following issues to the jury:
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

TEX. CODE CRIM. PROC. ANN. art. 37.071(b) (West 1981). Since the issue of provocation was not "raised by the evidence," the third special issue was not submitted to Drinkard's jury.

-3-

for which he is on trial was temporarily insane as a result of intoxication, then you may take such condition into consideration in mitigation of penalty attached for the offense for which the defendant is being tried.[3]

The jury answered both special issues affirmatively, and the trial court sentenced Drinkard to death. On direct appeal, the Texas Court of Criminal Appeals affirmed. Drinkard v. State, 776 S.W.2d 181 (Tex. Crim. App. 1989). Drinkard did not petition the United States Supreme Court for writ of certiorari.

After being denied habeas relief by the Texas Court of Criminal Appeals, Drinkard filed a federal habeas petition, along with a motion to stay his execution. The district court granted the motion to stay and ordered the state to respond to Drinkard's petition. After Drinkard filed an amended federal petition for habeas relief, the state filed a motion for summary judgment, and Drinkard filed a motion for partial summary judgment. The district court granted the state's motion for summary judgment, denied Drinkard's motion for partial summary judgment, and vacated the stay. Drinkard filed a notice of appeal and a motion for a CPC to appeal the district court's denial of his petition. The district court denied the motion. Drinkard applied for a CPC with this court in September 1994, which was carried with this appeal. We granted an emergency motion for stay of execution in December 1995.

---

[3]This instruction was given pursuant to section 8.04(b) of the Texas Penal Code, which is a provision applicable to capital and non-capital cases in both the guilt and sentencing phases. See TEX. PENAL CODE ANN. § 8.04(b) (West 1994).

-4-

In determining whether a CPC should issue in this case, we must consider the question in the light of some relevant statutory amendments under the AEDPA. Before the President signed the AEDPA into law on April 24, 1996, a petitioner could not appeal a district court's ruling on a habeas petition that concerned detention arising from state court proceedings unless a district or circuit judge issued a CPC. 28 U.S.C. § 2253, amended by AEDPA, § 102; FED.R.APP.P. 22(b), amended by AEDPA, § 103. In Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), the Court stated the standard governing the issuance of a CPC: the applicant must make "a substantial showing of the denial of a federal right." Id. at 893, 103 S.Ct. at 3394-95 (emphasis added). A "substantial showing" requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further." Id. at 893 n.4, 103 S.Ct. at 3394 n.4 (internal citations and quotation marks omitted).

Section 102 of the AEDPA amended 28 U.S.C. § 2253 to require that a petitioner obtain a "certificate of appealability" from a circuit judge.[4] AEDPA, § 102 (to be codified at 28 U.S.C. §

_____

[4]There appears to be a discrepancy between the amended version of 28 U.S.C. § 2253 and the amended version of Rule 22(b) of the Federal Rules of Appellate Procedure. Section 103 of the AEDPA amended Rule 22(b) to reflect the change in terminology contained

2253(c)(1)).  Section 2253 now requires that a circuit judge issue a COA "only if the applicant has made a substantial showing of the denial of a <u>constitutional right</u>."  AEDPA, § 102 (to be codified at 28 U.S.C. § 2253(c)(2)) (emphasis added).

The Tenth Circuit recently held that "Congress drafted the plain language of the newly enacted § 2253(c)(2) to codify the <u>Barefoot</u> standard for issuance of a certificate of probable cause." <u>Lennox v. Evans</u>, 87 F.3d 431, 434 (10th Cir. 1996).  Disagreeing with the Ninth Circuit's holding in <u>Williams v. Calderon</u>, 83 F.3d 281 (9th Cir. 1996),[5] the court explained:

> Although the Court [in <u>Barefoot</u>] used the word "federal," an applicant seeking a certificate of probable cause to appeal a district court's denial of a § 2254 petition for writ of habeas corpus must demonstrate a substantial showing of constitutional error underlying the state conviction.  We have always read the <u>Barefoot</u> standard to require a habeas petitioner to make a substantial showing of the denial of a federal constitutional right.  Indeed, in the context of federal habeas review of a conviction entered in state court, it is the only intelligible reading.

87 F.3d at 434.  We agree with the Tenth Circuit.  <u>Accord</u> <u>Reyes v. Keane</u>, No. 95-2650, 1996 WL 420347, at *4 (2d Cir. July 29, 1996).

---

in § 2253.  AEDPA, § 103 (to be codified at FED.R.APP.P. 22(b)).  Even after the amendment, however, Rule 22(b) still permits either a district or circuit judge to issue a COA, AEDPA, § 103 (to be codified at FED.R.APP.P. 22(b)), as opposed to only a circuit judge under § 2253(c)(1).  The posture of this case obviates the need to address this discrepancy.

[5]The Ninth Circuit concluded summarily that the standard for obtaining a certificate of appealability is "more demanding" than the <u>Barefoot</u> standard.  <u>Id.</u> at 286.  The court then "assume[d], without deciding, that section 2253(c)(2) does not apply retroactively."  <u>Id.</u>

"Because the standard governing the issuance of a certificate of appealability requires the same showing as that for obtaining a certificate of probable cause, application of § 102 of the [AEDPA] to Petitioner's request for a certificate of probable cause would not constitute retroactive application of a statute under Landgraf [v. USI Film Products, ___ U.S. ___, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)]." 87 F.3d at 434. We will therefore treat Drinkard's application for CPC as an application for COA.

A

Drinkard first argues that the jury instruction concerning "temporary insanity caused by intoxication" given during the penalty phase of his trial violated the Eighth Amendment. Drinkard contends that the jury charge precluded the jury from considering evidence of lesser degrees of intoxication in mitigation of his sentence.[6]

---

[6]Although the state argues that we have already considered and rejected the challenge that Drinkard raises in this case, our review of the cases cited by the state convinces us otherwise. See Lackey v. Scott, 28 F.3d 486 (5th Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); Barnard v. Collins, 958 F.2d 634, 639 (5th Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 990, 122 L.Ed.2d 142 (1993); James v. Collins, 987 F.2d 1116 (5th Cir.), cert. denied, ___ U.S. ___, 114 S.Ct. 30, 125 L.Ed.2d 780 (1993); and Cordova v. Collins, 953 F.2d 167 (5th Cir.), cert. denied, 502 U.S. 1067, 112 S.Ct. 959, 117 L.Ed.2d 125 (1992).

(1)

The Eighth Amendment requires an individualized determination of sentencing in death penalty cases, based on the character of the defendant, the record of the defendant, and the circumstances of the offense.  Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion).  In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court reversed a death sentence on Eighth Amendment grounds because the Ohio death penalty statute limited the consideration of mitigating evidence.  According to Lockett, a statute cannot constitutionally preclude a sentencer "from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  Id. at 604, 98 S.Ct. at 2964 (plurality opinion).  In Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), a majority of the Court embraced Lockett's plurality rule in striking down a death sentence on Eighth Amendment grounds because the trial judge limited his consideration of mitigating evidence.  According to Eddings, a sentencer cannot "refuse to consider, as a matter of law, any relevant mitigating evidence."[7]

---

[7]See also Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) ("[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing sentence.").

Id. at 114, 102 S.Ct. at 877.  The Eddings Court additionally noted that the trial judge's actions were "as if the trial judge had instructed the jury to disregard the mitigating evidence."  Id., 102 S.Ct. at 877.

Drinkard does not, and could not, argue that the Texas special issues standing alone prevented the jury from considering his intoxication at the time of the offense.  Lackey v. Scott, 28 F.3d 486, 489 (5th Cir. 1994) ("[T]he Texas sentencing scheme does not preclude the jury from giving mitigating effect to evidence of a defendant's voluntary intoxication at the time of the offense"), cert. denied, ___ U.S. ___, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); Cordova v. Collins, 953 F.2d 167, 170 (5th Cir.) (same), cert. denied, 502 U.S. 1067, 112 S.Ct. 959, 117 L.Ed.2d 125 (1992); Kelly v. Lynaugh, 862 F.2d 1126, 1133 (5th Cir. 1988) (same), cert. denied, 492 U.S. 925, 109 S.Ct. 3263, 106 L.Ed.2d 608 (1989). Instead, he challenges the effect of the special instruction on the special issues.  Drinkard argues that the challenged instruction on "temporary insanity caused by intoxication" prevented the jury from considering and giving effect to evidence of his intoxication if the jury concluded that it did not rise to the level of temporary insanity, evidence that the jury otherwise could have considered through the two special issues standing alone.[8]

---

[8]The prohibition against the announcement of new constitutional rules of criminal procedure on collateral review contained in the line of cases beginning with Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), does not bar

The proper standard for reviewing a challenged jury instruction in the capital sentencing context is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). This "reasonable likelihood" standard does not require the petitioner to prove that the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an impermissible interpretation. Id. at 380, 110 S.Ct. at 1198. We must analyze the challenged jury instruction within the context of the overall jury charge. Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a `commonsense understanding of the instructions in the light of all that has

relief in this case. Granting the relief Drinkard requests would not be a "new rule" under the Teague line of cases because it would represent the application of "a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law." Penry, 492 U.S. at 319, 109 S.Ct. at 2947 (internal quotation marks and citation omitted); see also Wright v. West, ___ U.S. ___, ___, 112 S.Ct. 2482, 2497, 120 L.Ed.2d 225 (1992) (O'Connor, J., concurring in judgment) ("If a proffered factual distinction between the case under consideration and pre-existing precedent does not change the force with which the precedent's underlying principle applies, the distinction is not meaningful . . . .").

taken place at the trial.'" Johnson v. Texas, ___ U.S. ___, ___, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993) (quoting 494 U.S. at 381, 110 S.Ct. at 1198).[9]

(a)

Focusing initially on the language of the challenged instruction itself, we conclude that there is not a "reasonable likelihood" that the jury applied it so as to place consideration of non-insane intoxication beyond its effective reach.[10] The instruction reads:

---

[9]Although parts of the following analysis may appear contrary to Johnson's admonition, the dispute between the majority and the dissent on the possibility of an impermissible interpretation requires our close examination of the challenged instruction. In any case, our final conclusion does not rest upon parsing the language of the instruction, but instead upon a review of the instruction in the context of the instructions and special issues as a whole, and in the light of the proceedings before the jury.

[10]Evidence that Drinkard was intoxicated at the time of the murders is clearly "constitutionally relevant." Evidence implicates the Eighth Amendment under Lockett and Eddings if it concerns "any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604, 98 S.Ct. at 2964. As argued by Drinkard's counsel, a jury could find that a defendant who was intoxicated at the time of the commission of a dangerous offense would not be dangerous in prison, where alcohol is not available. See Parker v. Dugger, 498 U.S. 308, 314, 111 S.Ct. 731, 736, 112 L.Ed.2d 812 (1991) (stating that evidence that defendant "was under the influence of large amounts of alcohol and various drugs . . . during the murders" was mitigating evidence); Skipper v. South Carolina, 476 U.S. 1, 5, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986), the Supreme Court held that evidence concerning the defendant's good behavior in jail while awaiting trial was mitigating evidence, on the theory that a jury could opt to impose life in prison instead of a death sentence if convinced that the defendant would not be dangerous in prison.

-11-

Evidence of temporary insanity caused by intoxication may be introduced by the defendant in mitigation of the penalty attached to the offense for which he is being tried. Intoxication means disturbance of mental or physical capacity resulting from the introduction of any substance into the body. Temporary insanity caused by intoxication means that the defendant's mental capacity was so disturbed from the introduction of the substance into the body that the defendant did not know that his conduct was wrong. Therefore, if you find that the defendant at the time of the commission of the offense for which he is on trial was temporarily insane as a result of intoxication, then you may take such condition into consideration in mitigation of penalty attached for the offense for which the defendant is being tried.

In attempting to understand the significance of this instruction to Drinkard's claim of a deprivation of a constitutional right, we must consider whether there is a reasonable likelihood that this instruction, within its four corners, actually precluded the jury from considering Drinkard's non-insane intoxication as a mitigating factor. We must first set out, therefore, what the instruction actually states.

The first sentence clearly indicates that the instruction is about temporary insanity caused by intoxication not about intoxication in general. It reads "[e]vidence of temporary insanity caused by intoxication," not "evidence of intoxication." (Emphasis added.) The second sentence defines "intoxication" as the "disturbance of mental or physical capacity resulting from the introduction of any substance into the body." According to the third sentence, "temporary insanity caused by intoxication means that the defendant's mental capacity was so disturbed from the introduction of a substance into his body that the defendant did

-12-

not know that his conduct was wrong." (Emphasis added.) The instruction concludes, "Therefore, if you find that the defendant at the time of the commission of the offense for which he is on trial was temporarily insane as a result of intoxication, then you may take such condition into consideration in mitigation of the penalty . . . ." (Emphasis added.) This concluding sentence directs the sentencer to take into account a defendant's "temporary insanity caused by intoxication" if it meets the definition contained in the preceding sentence.

The instruction effectively tells the jury how to go about evaluating a defendant's claim that, at the time he committed the crime, his intoxication rendered him temporarily insane; that is, that because of his temporary insanity caused by intoxication, he could not have deliberately caused the death of the deceased--a specific response to the first special issue under the Texas capital sentencing scheme, which asks whether the conduct was deliberate and whether it was committed "with the reasonable expectation that the death of the deceased or another would result."[11] The instruction thus represents a permissible attempt to structure how the sentencing jury will consider a particular mitigating circumstance, namely, temporary insanity caused by intoxication. See, e.g., Boyde, 494 U.S. at 377, 110 S.Ct. at 1196 (1990) ("States are free to structure and shape consideration of

---

[11]See supra note 2.

mitigating evidence `in an effort to achieve a more equitable administration of the death penalty'" (quoting <u>Franklin v. Lynaugh</u>, 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988))). "In other words, the challenged special instruction invited the jury affirmatively to consider, as a mitigating factor, any evidence that the crime had been committed while Drinkard was temporarily insane as a result of intoxication." Dist.Ct.Op., at 36.

Drinkard argues that the use and placement of the term "such condition" in the fourth sentence of the challenged instruction plausibly informs a jury that it can only consider intoxication ("such condition") if it rises to the level of temporary insanity. We cannot agree, however, that there is a reasonable likelihood that the jury interpreted the term "such condition" as referring to the single word, "intoxication." The focus of the instruction from the first is on "temporary insanity caused by intoxication" as a mitigating factor, not "intoxication" as a mitigating factor. Within the concluding sentence itself, "such condition" naturally refers, as a matter of grammatical construction, to the entire antecedent phrase, "temporary insanity caused by intoxication." Thus, we cannot say there is a reasonable likelihood that the jury interpreted "such condition" as referring to a truncated part of the preceding phrase, i.e., "intoxication," as opposed to the entire antecedent phrase, "temporary insanity caused by intoxication."

Although we cannot say that there is not some remote possibility that the jury, as a whole, could have interpreted the instruction standing alone so as to preclude consideration of non-insane intoxication, or that a single, isolated, hypothetical "reasonable juror" could not have interpreted the instruction in such a manner,[12] these are not the touchstones of our inquiry. Applying the <u>Boyde</u> standard, we simply cannot say that there is a reasonable likelihood that the jury as a whole, with "[d]ifferences . . . in interpretation . . . thrashed out in the deliberative process," <u>Boyde</u>, 494 U.S. at 381, 110 S.Ct. at 1198, construed the instruction standing alone as precluding consideration of intoxication that did not rise to the level of temporary insanity.[13]

_____

[12]Prior to <u>Boyde</u>'s "reasonable likelihood" standard, we judged jury instructions in this context by the "reasonable juror" standard. See <u>California v. Brown</u>, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987).

[13]We are unpersuaded by dicta in <u>Tucker v. State</u>, 771 S.W.2d 523 (Tex. Crim. App. 1988), which suggests that the plain language of the special instruction does not allow a jury to consider mitigating evidence of intoxication unless it rises to the level of temporary insanity. <u>Id.</u> at 534 & n.4. The Texas Court of Criminal Appeals itself has not followed this dicta in subsequent cases. <u>See, e.g.</u>, <u>Ex Parte Rogers</u>, 819 S.W.2d 533, 536-37 (Tex. Crim. App. 1991) (Clinton, J., dissenting) (citing <u>Tucker</u> to argue that court should have granted petitioner relief because special instruction on temporary insanity did not enable jury to give effect to non-insane intoxication).
    We are similarly unpersuaded by the dissent in <u>Nethery v. Collins</u>, 993 F.2d 1154 (5th Cir. 1993), which argued that the special instruction precluded consideration of non-insane intoxication based on the "reasonable juror" standard. <u>Id.</u> at 1163-65 (King, J., dissenting). Our holding rests on the application of the more stringent "reasonable likelihood" standard.

(b)

Turning to the instructions as a whole, <u>Cupp v. Naughten</u>, 414 U.S. at 146-47, 94 S.Ct. at 400, we cannot say that there is a reasonable likelihood that the jury interpreted the instructions as precluding the consideration of Drinkard's intoxication if it did not rise to the level of temporary insanity. Prior to the challenged instruction, the trial court clearly and unambiguously charged the jury to consider all of the evidence in answering the special issues:

> [I]n determining each of these Special Issues, you may take into consideration <u>all</u> of the evidence submitted to you in the full trial of the case, that is, <u>all</u> of the evidence submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and <u>all</u> of the evidence, if any, admitted before you in the second part of the trial wherein you are called upon to determine the answers to Special Issues hereby submitted to you.

(Emphasis added.) This general instruction necessarily and undeniably directed the jury to consider Drinkard's evidence of intoxication in answering the special issues. The fact that the charge included this affirmative instruction to consider <u>all</u> the evidence strongly supports our conclusion that there is not a reasonable likelihood that the jury understood the instructions, as a whole, as precluding consideration of non-insane intoxication.

---

Finally, although some language in our recent decision in <u>Rogers v. Scott</u>, 70 F.3d 340 (5th Cir. 1995), possibly could be read to support a contrary conclusion, <u>id.</u> at 343-44, the court clearly did not reach the ultimate question before us today. <u>Id.</u> at 344.

The inclusion of this general instruction in the charge also undercuts the possibility of concluding that there is a reasonable likelihood that the jury interpreted the existence of an explicit instruction mentioning intoxication in the context of temporary insanity as implicitly foreclosing the consideration of lesser forms of intoxication. In other words, we cannot say that it is reasonably likely that the jury, instructed to consider "evidence of temporary insanity caused by intoxication," would interpret this instruction as meaning that it "could consider evidence of intoxication only if it produces temporary insanity." This variation on the canon of statutory interpretation expressio unius--mentioning one thing implies the exclusion of another--is particularly inapt where the implication of exclusion flies in the face of an affirmative direction not to exclude consideration of any evidence. Cf. Blystone v. Pennsylvania, 494 U.S. 299, 308, 110 S.Ct. 1078, 1084, 108 L.Ed.2d 255 (1990) (holding that specific mitigating factor providing for consideration of "extreme" disturbance, "substantial" impairment, or "extreme" duress did not foreclose jury's consideration of lesser degrees of disturbance, impairment, or duress because trial court "made clear to the jury that [list of statutory mitigating factors] were merely items it could consider" and trial court instructed jury that it could consider "any other mitigating matter"). Although the Court in Boyde explicitly distinguished "those instances where we have found broad descriptions of the evidence to be considered insufficient to

cure statutes or instructions which clearly directed the sentencer to disregard evidence," 494 U.S. at 384, 110 S.Ct. at 1200 (citing Hitchcock v. Dugger, 481 U.S. 393, 398-99, 107 S.Ct. 1821, 1824-25, 95 L.Ed.2d 347 (1987), and Lockett, 438 U.S. at 608, 98 S.Ct. at 2966),[14] the challenged instruction in this case did not clearly direct the sentencer to disregard intoxication for all reasons except to the extent that it supported temporary insanity caused by intoxication.

(c)

Furthermore, the interplay between the challenged instruction and the special issues also leads us to conclude that there is not a reasonable likelihood that the jury applied the challenged instruction so as to preclude consideration of non-insane intoxication. The challenged instruction, by its own terms and as a matter of common sense, is relevant only to the first of the two

_____

[14]In Hitchcock, the petitioner challenged the jury charge given to an advisory jury at the penalty phase of his capital murder trial. The charge, pursuant to Florida statute, listed seven specific mitigating factors for the jury to consider. 481 U.S. at 396 n.3, 107 S.Ct. at 1823 n.3. The judge instructed the jury that "`[t]he mitigating circumstances which you may consider shall be the following [list of statutory mitigating circumstances].'" Id. at 1824, 107 S.Ct. at 1824 (quoting Tr. of Advisory Sentence) (second alteration added). The petitioner argued that none of the seven factors allowed the jury to consider evidence of his background, character, and potential for rehabilitation in mitigation of penalty. Id. at 396-98, 107 S.Ct. at 1823-24. The Court found that "it could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances," and held that the petitioner's death sentence violated the Eighth Amendment. Id. at 398-99, 107 S.Ct. at 1824-25.

special issues that the jury was required to answer under the Texas capital sentencing scheme and thus would have no effect on the jury's consideration of the second special issue.[15]

The first special issue requires the jury to look back in time and determine whether the defendant acted deliberately in committing the murder.  Tex. Code Crim. Proc. Ann. art. 37.071(b) (West 1981) ("[W]hether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.").  The second special issue requires the jury to look forward to the defendant's future dangerousness.  Art. 37.071(b) ("[W]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.").  The challenged instruction itself asks the jury to consider whether the defendant was temporarily insane (or, more specifically, "did not know his conduct was wrong") as a result of intoxication "at the time of the commission of the offense,"  The focus of the challenged instruction, like

---

[15]The Texas sentencing scheme does not violate the Constitution if a jury can give effect to a particular type of mitigating evidence only when answering one of the special issues. See Graham v. Collins, ___ U.S. ___, ___, 113 S.Ct. 892, 902, 122 L.Ed.2d 260 (1993) ("Even it Graham's evidence, like Penry's, had significance beyond the scope of the first special issue, it is apparent that Graham's evidence--unlike Penry's--had mitigating relevance to the second special issue concerning his likely future dangerousness. . . .  This distinction leads us to conclude that neither Penry nor any of its predecessors "dictates" the relief Graham seeks within the meaning required by Teague.").

that of the first special issue, is backward looking to the time of the offense. We thus think that it is not reasonably likely that the jury would have applied the instruction to the second special issue. In other words, even if there is a reasonable likelihood that the jury somehow interpreted the challenged instruction as removing from its consideration evidence of Drinkard's non-insane intoxication in answering the first special issue, we cannot say that there is a reasonable likelihood that the jury applied the challenged instruction to the second special issue so as to preclude consideration of evidence of non-insane intoxication in answering that issue.

As in Boyde, "[e]ven were the language . . . less clear than we think, the context of the proceedings would have led reasonable jurors to believe that evidence of [Drinkard's non-insane intoxication] could be considered in mitigation" in answering the second special issue. 494 U.S. at 383, 110 S.Ct. at 1199. In Boyde, the Court pointed to "[a]ll the defense evidence presented at the penalty phase" to support its conclusion that there was not a reasonable likelihood that the jury misinterpreted the instruction challenged in that case. Id. at 383-84, 110 S.Ct. at 1199-1200. On the other hand, in Graham, the Court emphasized that "both of Graham's two defense lawyers vigorously urged the jury to answer `no' to the special issues based on the evidence" in denying habeas relief. Graham v. Collins, ___ U.S. at ___, ___, 113 S.Ct. 892, 902, 122 L.Ed.2d 260 (1993). Here, as in Graham, we examine

-20-

the context within which the instruction was given--specifically,
the arguments of Drinkard's attorneys--to understand the effect of
the instruction. Drinkard's two attorneys described in great
detail at the sentencing hearing how the jury could take into
account Drinkard's intoxication.[16]

At the sentencing hearing, the state waived its right to open.
Thus, Drinkard's attorneys, Mr. Heath and Mr. Taylor, argued first.
Mr. Heath first introduced the subject of intoxication evidence:

> I also want you to think about the long talks we had
> about intoxication. Each and every act of wrongdoing
> that Mr. Drinkard has committed since his release from
> the penitentiary at least by 1979 has been related to
> excessive intoxication. The incidents with his wives
> that were gone into by the State, you think about it.
> Every time the ultimate issue was Mr. Drinkard was
> extremely intoxicated when these occurred.
>     The evidence in this particular case was, at least
> by everyone that saw him, was that Mr. Drinkard was
> drinking heavily on the evening in question, and we are
> told in this jury charge that you can consider
> intoxication in mitigation of punishment, and I'm sure
> the first thought that comes to your mind is how are you
> going to do that in this case?

Trial tr., vol. 36, at 5. Mr. Heath then related the intoxication
evidence to special issue number one, arguing that intoxication had
rendered Drinkard temporarily insane:

> . . . Special issue number one talks about a
> deliberate act. I submit to you))and I'm still not
> convinced Mr. Drinkard by his own hand took all three of

---

[16]The arguments of counsel are relevant to a jury's
interpretation of challenged jury instructions, but the court's
instructions carry substantially more weight. 494 U.S. at 384-85,
110 S.Ct. at 1200. To the extent relevant, the arguments of
counsel must also be analyzed in context. Id. at 385, 110 S.Ct. at
1200.

those lives. I'm still not convinced there weren't other individuals involved.

[Objection by the state sustained.]

But where intoxication to the point of temporary insanity comes in is when we talk about an act deliberately done. That's what logically comes to mind. Mr. Drinkard was drunk to the point of temporary insanity. The State would want you to believe that Michael Watson was stumbling drunk that night but not Richard Drinkard. It's amazing. They spent hours together drinking Schnapps, Miller Lite, and then Mr. Drinkard topped it off with a Mandrax.

Trial tr., vol. 36, at 5-6. Then Mr. Heath related the intoxication evidence to special issue number two, arguing that Drinkard would not be dangerous if not intoxicated:

One thing that you can utilize sitting as a juror is your common sense. Common sense dictates that on the night in question Mr. Drinkard was drunk out of his mind, and then let's talk about this intoxication relationship to all of the offenses that Mr. Drinkard has committed. How does that tie in to issue number two? Real simply. Mr. Drinkard is not a dangerous individual when he is not intoxicated. I submit to you if Richard Drinkard spends a life sentence in the Texas Department of Corrections he is not going to get intoxicated, and if he's not intoxicated he's not dangerous. Think about it. Every offense that these individuals got up on the stand and talked about, every offense, a DWI, the BB gun incident, all the recent incidents were alcohol and drug-related.

Trial tr., vol. 36, at 6-7. After discussing other aspects of the case, Mr. Heath returned to the intoxication evidence to conclude his argument, again arguing temporary insanity with regard to special issue number one, and intoxication generally with regard to special issue number two:

I think the record is clear that Ricky Drinkard was temporarily insane on the night in question, and I anticipate Mr. Gotschall standing up at sometime and arguing how can anyone commit acts like these, and I submit to you they can't in their right mind. Mr.

-22-

Drinkard was not in his right mind that night, and I beg each and every one of you to consider the facts and the evidence in this case, and if you do you will come to the proper conclusion, and that is that the acts were not done deliberately by reason of temporary insanity and further that if Mr. Drinkard is locked up, not allowed to take drugs and not allowed to drink to excess, he will not be a continuing threat to society. Thank you.

Trial tr., vol. 36, at 11. After Mr. Heath concluded his argument, Mr. Taylor further argued on behalf of Drinkard. He organized his discussion of the intoxication evidence in a manner similar to that argued by Mr. Heath. First, he introduced the subject of intoxication evidence:

Intoxication, alcohol, drugs is almost at an epidemic stage in our society. It is))constitutes a social disease, the toll of which is enormous, not only in this case but in society in general. Just look at some of the people that have been on this witness stand. Look at Jerry Michael Watson. He contributes little or nothing to society. He works very little and sits around and gets drunk every day. Doug Bailey drinks every day.

You know, obviously Ricky Drinkard suffers from the social disease of alcohol and drugs. From the evidence, from Rick's statements you know that on the night in question that there were at least two 12-packs of beer. Ricky in his statement, which is in evidence, which you can read again, stopped off on the way to his brother's house, bought a 12-pack of beer. They consumed that. They consumed two pints of Schnapps. He went and bought another 12-pack of beer. They consumed that. There was marijuana. Then there was a Mandrax above all that.

Trial tr., vol. 36, at 13-14. Mr. Taylor then related the intoxication evidence to special issue number one, arguing that intoxication rendered Drinkard temporarily insane:

. . . I suggest to you, as Mr. Heath has talked to you about, that there's no way that anybody can consume those quantities of alcohol, ingest drugs into their system and be conscious of what they're doing, and

-23-

there's no way anyone under those circumstances can deliberately do anything.

The State would have you believe that Ricky Drinkard deliberately, intentionally with forethought, went to Louann Anthony's townhouse to take the lives of at least two individuals, if not three, because they tried to elicit testimony that tried to show you that Ricky knew not only Louann Anthony would be there but her sister or cousin with her boyfriend; and they would have you believe he deliberately went there with the idea of killing three people. I suggest to you based on the evidence and based on alcohol and drugs there's no way that Richard Drinkard could have in a moment of sanity been involved in such.

When you read and look at special issue number one, I suggest to you that the only possible answer that this jury could put down is "no."

Trial tr., vol. 36, at 14-15. Mr. Taylor then related the intoxication evidence to special issue number two, arguing that Drinkard would not be dangerous if not intoxicated:

. . . Some of the acts that the State brought to you in punishment, the burglaries were all done by a young man 16 and 17 years of age; and after that the problem with Ricky Drinkard has been alcohol and drugs. Mr. Heath))during voir dire you were told that when you read these questions, if you get that far, that some of the terms are not going to be defined for you. In fact, in the two special issues none of the terms are going to be defined for you. It's whatever or however you wish to define it.

One of those terms was "society." It can be whatever you want it to be. If Ricky Drinkard by your verdict received life imprisonment, his society is going to be prison life.

[Objection by the state overruled.]

And there are not drugs and there is not alcohol available in prison life, and I suggest to you that the social disease of alcohol and drugs are not going to be available to Ricky Drinkard in the society of prison life and that there's no evidence in the record whatsoever that would have you answer special issue number two "yes." Take away the drugs. Take away the social disease of alcohol. There's no evidence of violence, and I suggest to you that a proper verdict with respect to

special issue number two would be "no" based on the evidence and based on the law in this case.

Trial tr., vol. 36, at 15-16.

Drinkard's two attorneys each explained in great detail exactly how the jury could account for intoxication in mitigation of Drinkard's sentence in answering both special issues. We think that their explanations would have led the jury to believe that it could consider Drinkard's intoxication in answering the second special issue even if it did not rise to the level of temporary insanity as defined by the challenged instruction.[17]  At a minimum,

---

[17]The prosecutor mentioned the relevance of the intoxication evidence to the second issue only in passing.  His focus was instead on the intoxication evidence as it related to the first special issue:

> The Defense talks to you about this issue of temporary insanity due to intoxication, and <u>I suppose that comes in mostly))they connected up somehow with both special issues, but to consider that at all))and I suggest after you look at the evidence you won't consider that at all</u>. To consider that at all you have to decide, one, that at the time of the deaths Mr. Drinkard was intoxicated. This is 3:00 o'clock in the morning.  The))Mike Watson testified when he dropped his brother off it was around midnight or so or when he last saw his brother it was around midnight.  There was obviously drinking and marijuana smoking and that sort of thing.  We don't have any doubt that Mr. Drinkard was intoxicated.  That's not the question.
> You have to decide from the evidence, one, whether Mr. Drinkard was intoxicated and, two, that by reason of this voluntary intoxication he didn't basically know right from wrong, he didn't know what he was doing when he killed these three people was wrong. Okay? You might find, well, maybe he wouldn't have hit him so many times if he wasn't drunk.  That doesn't make any difference. You have to find that his intoxication rendered him to such a state that the defendant))in the charge, the defendant did not know that his conduct was wrong, and we know that's not true, because look at the evidence as to

-25-

then, we can say that there is not a reasonable likelihood that the jury applied the instructions so as to preclude consideration of lesser forms of intoxication in answering the second or "look-forward" issue.

(d)

In sum, our larger task is to assure that all relevant evidence that Drinkard submitted in mitigation of the death penalty was within the effective reach of the jury, so that it had some opportunity to consider that evidence and to give to it whatever mitigating effect it deemed appropriate. Reading the challenged instruction standing alone, in connection with the general instruction to consider all the evidence and the special issues themselves, and, finally, in the light of the proceedings at trial, specifically, the arguments of Drinkard's attorneys, we simply cannot agree with Drinkard that there is a reasonable likelihood the jury interpreted the instructions in such a way as to exclude consideration of his non-insane intoxication.

---

what he did after he killed these three people.
Trial tr., vol. 36, at 22-23 (emphasis added). We do not think that this single statement negates the voluminous arguments of Drinkard's attorneys concerning intoxication, as it relates to answering the second special issue, in determining whether there is a reasonable likelihood that the jury interpreted the charge in such a way as to preclude consideration of non-insane intoxication. See Boyde, 494 U.S. at 385, 110 S.Ct. at 1200 ("`[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974))).

(2)

While this appeal was pending, the President signed the AEDPA into law. Title I of the AEDPA contains a series of amendments to existing federal habeas corpus law. The insistence of Judge Garza's dissent compels an alternative holding in this case, which requires our determining whether the standards of review for state court decisions on the merits contained in 28 U.S.C. § 2254(d)(1), as amended by title I of the AEDPA, § 104(3), applies to our review of Drinkard's appeal. Paragraph (d), as now amended, reads as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) <u>resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States</u>; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA, § 104(3) (to be codified at 28 U.S.C. § 2254(d)) (emphasis added).

The state argues that the new standards of review contained in subsection (d)(1) apply to all habeas cases pending before us when the AEDPA was signed into law because they are jurisdictional and procedural in nature. On the other hand, Drinkard relies on the Tenth Circuit's decision in <u>Edens v. Hannigan</u>, No. 94-3352, 1996 WL 339763, at *8 n.1 (10th Cir. June 20, 1996), and a number of

-27-

district court cases to argue that the standards of review do not apply to his appeal.[18]  For the following reasons, we agree with the

[18]We must say that we are unpersuaded by the cases cited by Drinkard.  The Tenth Circuit in a footnote concluded summarily that the new habeas provisions do not apply because only § 107 contains an effective date provision.  Id.  In Grady v. Artuz, No. 94 Civ. 7362, 1996 WL 346332, at *26 n.1 (S.D.N.Y. June 24, 1996),  the court summarily concluded that the new provisions do not apply for the same reason.  Id. (citing United States v. Trevino, No. 96 C 828, 1996 WL 252570, at *2 n.1 (N.D.Ill. May 10, 1996)).  In Trevino, the district court concluded that the traditional presumption against retroactivity applies because the new provisions would have "a truly retroactive effect."  1996 WL 252570, at *2 n.1 (citing Maitland v. University of Minnesota, 43 F.3d 357, 363 (8th Cir. 1994)).  The court makes no attempt to explain why the provision at issue in Maitland, an amendment to Title VII barring a person from challenging an action taken pursuant to consent decrees if that person had actual notice of a proposed consent decree and a reasonable opportunity to participate, 43 F.3d at 361, is analogous to the new habeas provisions for retroactivity purposes.  Finally, Drinkard cites Warner v. United States, No. LR-C-96-220, LR-CR-88-84, 1996 WL 242889, at *8 n.4 (E.D.Ark. May 10, 1996).  The court in Warner summarily concluded that the new provisions do not apply retroactively because only § 107 contains an effective date provision, and thus "[a]ccordingly, the Court need not consider what effect, if any, the amendments . . . might have in this case."  Id. (citations omitted).

Since Drinkard submitted his supplemental briefing on the AEDPA, the Second Circuit has also held that the habeas provisions do not apply to cases pending on appeal at the time of the enactment of the AEDPA.  Boria v. Keane, No. 95-2688, 1996 WL 397290 (2d Cir. July 17, 1996).  We are also unconvinced by the Second Circuit's reasoning.  The Second Circuit appears to have interpreted the following language in the Supreme Court's decision in Landgraf v. USI Film Products, ___ U.S. ___, ___, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994), as requiring an outcome-determinative test to ascertain retroactivity: "[T]he court must ask whether the new [statute] attaches new legal consequences to events completed before its enactment."  The Second Circuit declared with no analysis, "Assuming . . . that the new statute would require a different outcome [in this case], application of the new statute to these circumstances would be retroactive."  1996 WL 397290, at *1.  Once it determined that the statute was retroactive, the court looked for a "clear signal from Congress" that the habeas provisions were to apply retroactively.  Id. at *2.

state and hold that the new standards of review contained in § 2254(d)(1) apply to our review of Drinkard's appeal.[19]

(a)

Landgraf v. USI Film Products, ___ U.S. ___, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), provides the framework for answering the retroactivity question presented in this case. There, the Supreme Court addressed the circumstances under which statutory amendments apply to lawsuits based on events occurring before those

Finding none, the court held that the new habeas provisions did not apply to the case before it. Id. The Second Circuit, in one sentence, reduced the Supreme Court's extended attempt in Landgraf "to reconcile two seemingly contradictory statements found in our decisions concerning the effect of intervening changes in the law," ___ U.S. at ___, 114 S.Ct. at 1496, to a simple test: if an intervening change in the law alters the outcome of a case before a court, it does not apply retroactively unless Congress has given some "clear signal" to the contrary. As much as the Second Circuit's proffered test would happily simplify the task facing courts in this area, it is not a correct synthesis of the applicable law. See infra.

[19]The Seventh Circuit utilized an analysis similar to the one that follows and reached this same conclusion in Lindh v. Murphy, ___ F.3d ___, No. 95-3608, 1996 WL 517290 (7th Cir. Sept. 12, 1996)(en banc). In Lindh, the Seventh Circuit first found that the AEDPA amendment to the federal habeas corpus provision lacked an effective date provision and so should be given effect with respect to pending appeals in the absence of any retroactive impact. Id. at *4. The court then held that under Landgraf's established framework for determining retroactivity of a statute, the amendments were not retroactive and thus should be applied to cases pending on appeal at the time of the passage of the AEDPA. Id. at *9. Specifically, the court concluded that the amendments did not "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed," thus, the court found that the habeas provision, as amended, controlled consideration of the pending habeas petition. Id. (citing Landgraf v. USI Film Prods., 114 S.Ct. 1483, 1505 (1994)).

-29-

amendments.[20]  The Court declared that when Congress has not "expressly prescribed the statute's proper reach," we must determine whether the new statute has a "retroactive effect," ___ U.S. at ___, 114 S.Ct. at 1505, that is, "whether the new provision attaches new legal consequences to events completed before its enactment." ___ U.S. at ___, 114 S.Ct. at 1499.  In other words, the question is "whether [the statute] would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." ___ U.S. at ___, 114 S.Ct. at 1505.  If we conclude that the statute does not have a retroactive effect, we should apply the new statute in rendering a decision in the case before us. ___ U.S. at ___, ___, 114 S.Ct. at 1501, 1505.

(b)

Because Congress has not "expressly prescribed" the reach of the new habeas standard of review contained in § 2254(d)(1), as amended by § 104(3) of the AEDPA, Reyes v. Keane, No. 95-2650, 1996 WL 420347, *3 (2d Cir. July 29, 1996), we must turn to determine

---

[20]In Landgraf, the Supreme Court was attempting to harmonize "two seemingly contradictory statements in [its] decisions concerning the effect of intervening changes in the law." Id. at 1496.  In Bradley v. School Board of City of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), the Court declared, "[A] court is to apply the law in effect at the time it renders its decision."  In Bowen v. Georgetown University Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), the Court declared, "[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."  (Citations omitted).

whether the new standards of review contained in § 2254(d)(1), as amended by the AEDPA, have a retroactive effect in this case. The Court in Landgraf explained, "The conclusion that a particular rule operates `retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." ___ U.S. at ___, 114 S.Ct. at 1499. The change in law at issue here has no plausible connection to Drinkard's conduct on the night of the murder. Drinkard cannot argue that the new standards of review attach new legal consequences to that conduct by increasing his liability for that conduct or by imposing new duties on him based on that conduct. In other words, Drinkard obviously cannot argue that he relied on the existence of federal de novo review of claims adjudicated on the merits in state court proceedings the night he killed his three victims. This provision instead speaks to the power of the federal courts to grant habeas relief to state prisoners.

As standards of review governing our own review of Drinkard's appeal, subsection (d)(1) is easily classified as procedural in nature. Cf. United States v. Mejia, 844 F.2d 209, 211 (5th Cir. 1988) (citation omitted) ("A change in the standard of review is properly characterized as procedural rather than substantive because it neither increases the punishment nor changes the elements of the offense or the facts that the government must prove at trial."). Pointing to "the diminished reliance interest in

matters of procedure" and the fact that "rules of procedure regulate secondary rather than primary conduct," ___ U.S. at ___, 114 S.Ct. at 1502, the Court in <u>Landgraf</u> recognized that "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." ___ U.S. at ___, 114 S.Ct. at 1502.

Here, the change in procedural rules governing federal habeas review raises no concerns of retroactivity. Because the new rules involve federal standards of review of state court decisions, Drinkard must be able to show that he relied to some extent on the former federal standards of habeas review in making strategic, tactical, or other decisions during the state court litigation. Although during his state post-conviction proceedings, Drinkard may well have expected that the federal courts would review claims adjudicated on the merits in those proceedings <u>de novo</u>, "[a] statute does not operate `retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." ___ U.S. at ___, 114 S.Ct. at 1499 (internal citation and footnote omitted). In short, Drinkard cannot argue credibly that he would have proceeded any differently during his state post-conviction proceedings had he known at the time of those proceedings that the federal courts would not review claims adjudicated on the merits in the state court proceedings <u>de novo</u>. Because the new standards of review do not have a retroactive effect, we hold that they apply to

our review of Drinkard's appeal from the district court's denial of his petition for writ of habeas corpus.  We thus turn to the task of applying these new standards to Drinkard's appeal.

(3)

Drinkard turns the task of statutory interpretation on its head by arguing summarily that § 2254(d)(1), as amended, is essentially only a codification of Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and thus constitutes no change in federal habeas law.[21]  Instead, "[a]s with any statutory question, we begin with the language of the statute."  Matter of Greenway, 71 F.3d 1177, 1179 (5th Cir.) (citation omitted), cert. denied sub nom., Boyce v. Greenway, ___ U.S. ___, 116 S.Ct. 2499, 135 L.Ed.2d 191 (1996).

(a)

Subsection (d) limits the ability of the federal courts to grant habeas relief to state prisoners:

---

[21]We see more than a little irony in the suggestion that, after all the years of failed attempts by Congress to adopt a deferential standard of review in this area, Wright v. West, ___ U.S. at ___ n.9, 112 S.Ct. at 2491 n.9 (opinion of Thomas, J.); ___ U.S. at ___, 112 S.Ct. at 2498 (O'Connor, J., concurring in judgment), the passage of subsection (d)(1) represents no more than the codification of existing Supreme Court precedent, the meaning of which even the Supreme Court at times has difficulty explaining in a coherent manner.  See, e.g., Wright (exhibiting three different interpretations of the Teague line of cases in five opinions, none of which received a majority).  We will not complicate the task of statutory interpretation before us by turning first to the murkiness that is Teague retroactivity doctrine to determine whether the language of the statute somehow parallels Supreme Court precedent in this area.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
    (1) <u>resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States</u>; or
    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA, § 104(3) (to be codified at 28 U.S.C. § 2254(d)) (emphasis added). It applies when a state prisoner is seeking relief on the basis of a "claim that was adjudicated on the merits in State court proceedings." A federal court may grant habeas relief on the basis of such a claim only if the "decision" resulting from that adjudication (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States." Because a decision that is "contrary to" law is in some sense a decision "involv[ing] an unreasonable application of" law, the language of subsection (d)(1) on its face suggests at least one reading that would render the first clause a nullity. We, however, must read these two clauses in such a way as to give effect to both. <u>United States v. Nordic Village, Inc.</u>, 503 U.S. 30, 36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992).

Our analysis of these two clauses begins with the fundamental proposition that judicial decisions rest on answers to one or more

of three types of questions: questions of law, questions of fact, and mixed questions of law and fact (i.e., questions that require the application of law to facts). In order properly to understand section (d)(1), it should be read in conjunction with subsection (d)(2). See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) (indicating that we must read statute holistically, interpreting each of its portions in light of other portions). Although not at issue in this case, subsection (d)(2) of § 2254 applies to a state court's factual determinations. It bars federal court relief if the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence." AEDPA, § 104(3) (to be codified at 28 U.S.C. § 2254(d)(2)). Subsection (d)(2) thus supplies the applicable standard of review for the second type of question--a question of fact. It is clear to us, therefore, when the statute is read holistically, that subsection (d)(1) provides standards of review for questions of law and mixed questions of law and fact.

The second clause of subsection (d)(1), by its own language, refers to mixed questions of law and fact because it speaks of an "unreasonable application of[] clearly established law." Thus, when reviewing a mixed question of law and fact, a federal court may grant habeas relief only if it determines that the state court decision rested on "an unreasonable application of[] clearly

established Federal law, as determined by the Supreme Court," to the facts of the case. We read the first clause, on the other hand, as referring to questions of law. When reviewing a purely legal question, a federal court may grant habeas relief only if it determines that a state court's decision rested on a legal determination that was "contrary to . . . clearly established Federal law, as determined by the Supreme Court." Thus, the standard of review will vary depending on whether the question before the federal court is one of fact, one of law, or mixed.

With this understanding of the language of subsection (d)(2), we now proceed to apply it to Drinkard's appeal.

(b)

In applying § 2254(d)(1), as amended by the AEDPA, we must first determine whether Drinkard's claim regarding the challenged instruction during the sentencing phase of his trial was adjudicated on the merits in state court proceedings. Our review of the state post-conviction record indicates that there is no question that this claim was in fact adjudicated on the merits. Drinkard's petition for habeas relief in the state trial court challenged, inter alia, this instruction. The claim appeared in the state trial court's order designating issues as one of five that "this Court will resolve." The trial court entered findings of fact and conclusions of law, recommending to the Texas Court of Criminal Appeals that it should deny relief. In conclusion of law number 29, the court held:

> The trial court's instruction on the law of temporary insanity as a result of intoxication was sufficient to allow the jury to consider such in mitigation of punishment; evidence, if any, of voluntary intoxication could be given full mitigating effect within the scope of the special issues without additional jury instructions. Moreover, the trial court's charge on the law of temporary insanity as a result of intoxication did not preclude the jury from considering other types of mitigating evidence, did not mandate additional instructions, and did not impermissibly limit the jury's consideration of the applicant's alleged voluntary intoxication by requiring that it rise to the level of temporary insanity.

(Internal citations omitted). The Court of Criminal Appeals denied relief based on "the findings and conclusions of the trial court."[22]

We now must apply the new standards of review to determine whether we are permitted to grant relief to Drinkard under the AEDPA. The first question we ask is whether the state court's resolution of any legal questions underlying its decision on this claim was contrary to clearly established federal law. It is clear from conclusion of law number 29 that the state court made no error involving purely legal questions. The court correctly determined the law applicable to Drinkard's claim--that a sentencing jury cannot be precluded from considering any relevant mitigating evidence. Lockett; Eddings. We thus cannot say that the decision of state court was "contrary to" clearly established law as determined by the Supreme Court.

---

[22]In his brief to this court, Drinkard himself admits that "the Texas courts clearly addressed the merits of the claim" concerning the challenged instruction.

The next question before us is a mixed question of law and fact. In specific terms, we must decide whether the state court's determination--that the special instruction on temporary insanity caused by intoxication did not place beyond the reach of the jury's consideration the mitigating evidence of intoxication--involved an unreasonable application of this law to the facts of this case.

This "unreasonable application" standard of review of a state court decision must mean more than that a federal court may grant habeas relief based on its simple disagreement with the state court decision; this would amount to nothing more than a de novo review. See H.R.Conf.Rep.No. 518, 104th Cong., 2d Sess. 111 (1996), reprinted in 1996 U.S.C.C.A.N. 944, 944 (indicating in no uncertain terms that § 2254(d)(1) "requires deference to the determinations of state courts that are neither `contrary to,' nor an `unreasonable application of,' clearly established federal law" (emphasis added)). The use of the word "unreasonable" in formulating this restrictive standard of review implicitly denotes that federal courts must respect all reasonable decisions of state courts. Thus, given the statutory language, and in the light of legislative history that unequivocally establishes that Congress meant to enact deferential standards, we hold that an application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect. In other words, we can

grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.

In this case, the majority has applied the law of Lockett and Eddings, using the Boyde reasonable likelihood standard, to the specific facts of this case, analyzing the special instruction standing alone and in conjunction with the general instruction, the special issues, and the arguments of counsel. The majority has unequivocally concluded that the instruction at issue did not place mitigating evidence of intoxication beyond the reach of the jury. Judge Garza, on the other hand, has concluded that the challenged instruction removed the mitigating evidence of intoxication from the jury's consideration. It follows that when the jurists considering the state court ruling disagree in this manner, the application of the law by the state court is not unreasonable. The AEDPA therefore bars us from granting relief to Drinkard on this claim.

B

Drinkard also contends that the trial court should have instructed the jury to consider convicting him on a lesser-included offense. A defendant is entitled to a lesser-included offense instruction only if the evidence warrants such an instruction. Beck v. Alabama, 447 U.S. 625, 635-38, 100 S.Ct. 2382, 2388-90, 65 L.Ed.2d 392 (1980); Cordova v. Lynaugh, 838 F.2d 764, 767 (5th Cir.), cert. denied, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1988). To support such a claim, a petitioner must make "a showing

that the facts of the case and the laws of the State warrant such an instruction." Andrews v. Collins, 21 F.3d 612, 629 (5th Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995). Drinkard makes no showing on appeal that such evidence was produced at trial. Accordingly, we find this claim to be without merit.[23]

### C

Although Drinkard also challenged the constitutionality of the trial court's jury instruction regarding voluntary intoxication given during the guilt-innocence phase of his trial,[24] he conceded in supplemental briefing to this court that "the U.S. Supreme Court's recent decision in Montana v. Egelhoff, [___ U.S. ___, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)], forecloses [his] challenge to

---

[23]Drinkard also challenges the factfinding procedure used by the state habeas court. However, as counsel conceded at oral argument, none of the claims addressed in this appeal turn on factual findings. Accordingly, any errors in the state's factual findings did not prejudice Drinkard.

Drinkard raised other claims before the district court, but failed to brief them on appeal. He instead requested us to "consider the discussion of all claims and arguments contained in prior pleadings." Whether we consider issues not briefed on appeal is a matter of discretion. Compare Black v. Collins, 962 F.2d 394, 399 (5th Cir.) (addressing arguments made in district court even though not obligated to do so), cert. denied, 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 601 (1992) with Hobbs v. Blackburn, 752 F.2d 1079, 1083 (5th Cir.) (refusing to review "matters [that] have not been cited as error on appeal and have not been briefed"), cert. denied, 474 U.S. 838, 106 S.Ct. 117, 88 L.Ed.2d 95 (1985). We find Drinkard's non-briefed claims to be without merit, and we decline to address them further.

[24]As required by § 8.04(a) of the Texas Penal Code, the trial court instructed the jury that "[v]oluntary intoxication does not constitute a defense to the commission of a crime."

Tex.Pen.Code sec. 8.04(a), under the Due Process Clause of the Fourteenth Amendment."[25]

## III

To sum up, we hold today that the standard for granting a certificate of appealability under the AEDPA is the same as the Barefoot standard for granting a CPC. Because Drinkard has made a substantial showing of the denial of a constitutional right with respect to the application of the special instruction on temporary insanity caused by intoxication during the sentencing phase, we GRANT Drinkard's COA. We also hold that the special instruction on temporary insanity caused by intoxication given under § 8.04 of the Texas Penal Code did not violate Drinkard's Eighth Amendment rights by placing mitigating evidence of non-insane intoxication beyond the effective reach of the jury. We therefore AFFIRM the district court's denial of habeas relief. In the alternative, we hold that the new federal standards of review contained in 28 U.S.C. § 2254(d)(1), as amended by § 104(3) of the AEDPA, do not have a retroactive effect and thus are applicable to habeas cases pending at the time the President signed the AEDPA into law. Applying

---

[25]Drinkard argues summarily in his supplemental brief that the Supreme Court's decision in Egelhoff does not foreclose his "distinct Eighth Amendment challenge to the operation of section 8.04(a) during the guilt-innocence phase of [his] trial." A careful review of his briefing to this court reveals no "distinct Eighth Amendment challenge." He relies principally on Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), both of which rested on the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment.

those new standards of review to Drinkard's appeal, we conclude that § 2254(d)(1) bars relief because the state court's decision on Drinkard's claim was neither "contrary to, [n]or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." We therefore VACATE our earlier stay of execution.

COA GRANTED, Judgment AFFIRMED, and Stay VACATED.

EMILIO M. GARZA, Circuit Judge, dissenting:

At the guilt-innocence phase of Drinkard's capital murder trial, Drinkard presented evidence that he was intoxicated at the time of the murders. Pursuant to § 8.04(a) of the Texas Penal Code, the trial court instructed the jury as follows: "Voluntary intoxication does not constitute a defense to the commission of a crime." The jury returned a guilty verdict. At the punishment phase of Drinkard's trial, Drinkard once again presented evidence that he was intoxicated at the time of the murders. Pursuant to § 8.04(b) of the Texas Penal Code, the trial court instructed the jury as follows: "[I]f you find that the defendant at the time of the commission of the offense for which he is on trial was temporarily insane as a result of intoxication, then you may take such condition into consideration in mitigation of penalty attached for the offense for which the defendant is being tried." The jurors returned affirmative answers to both special issues submitted to them, and the trial court imposed a sentence of death. Today, the majority holds that there is no reasonable likelihood that Drinkard's jury interpreted the § 8.04(b) instruction given at the punishment phase of his trial to foreclose consideration of evidence of intoxication not rising to the level of temporary insanity. I respectfully disagree with the majority's analysis and conclusions; accordingly, I dissent.

The majority opinion makes three distinct holdings in support of its conclusion that the § 8.04(b) instruction did not violate the Eighth Amendment. First, the majority holds that the plain

language of the § 8.04(b) instruction concerns evidence of temporary insanity caused by intoxication, not evidence of intoxication in general. Second, the majority holds that even if the jury could have interpreted the § 8.04(b) instruction, standing alone, to foreclose consideration of lower-level intoxication, the jury could not have done so in light of the trial court's general instruction to consider all the evidence. Third, the majority holds that even if the jury interpreted the § 8.04(b) instruction to foreclose consideration of lower-level intoxication with regard to the first special issue, concerning deliberateness, the jury could not have done so with regard to the second special issue, concerning future dangerousness. I will address each of these arguments in turn.

At the outset, however, I emphasize the legal standard that the Supreme Court has established for such cases: A challenged jury instruction is unconstitutional if "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 1198, 108 L. Ed. 2d 316 (1990). In order to meet this standard, "a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction." *Id.*

The majority opinion correctly cites *Boyde*'s language, but then fails to follow its holding. According to *Boyde*, there is no constitutionally "correct" interpretation of a challenged instruction. Nor is there a constitutionally "erroneous" interpretation of a challenged instruction. In accordance with *Boyde*, the only relevant inquiry is whether there is a reasonable likelihood that the jury interpreted the challenged instruction in a constitutionally impermissible way. If so, the instruction is unconstitutional, regardless of whether other, constitutionally permissible interpretations are possible, or even more likely. In the context of the Supreme Court's holdings in *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), our inquiry must be whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of *any* relevant mitigating evidence, including evidence of intoxication falling short of temporary insanity. If we find such reasonable likelihood resulting from the court's instruction, we must grant habeas relief.

I

The majority first holds that the plain language of the § 8.04(b) instruction, standing alone, does not foreclose consideration of lower-level intoxication. The challenged jury instruction reads as follows:

-45-

> Evidence of temporary insanity caused by intoxication may be introduced by the defendant in mitigation of the penalty attached to the offense for which he is being tried.  Intoxication means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.  Temporary insanity caused by intoxication means that the defendant's mental capacity was so disturbed from the introduction of the substance into the body that the defendant did not know that his conduct was wrong.  Therefore, *if you find that the defendant at the time of the commission of the offense for which he is on trial was temporarily insane as a result of intoxication, then you may take such condition into consideration in mitigation of penalty* attached for the offense for which the defendant is being tried.

(emphasis added).  The majority contends that there is no reasonable likelihood that the jury read this instruction to bar its consideration of lower-level intoxication as a mitigating factor.  However, the prosecution urged such an exclusive interpretation at trial, and both Texas courts and this Circuit have read the instruction to be just such a bar.

Specifically, the majority holds that there is no reasonable likelihood that the jury in Drinkard's case interpreted the words "such condition" in the phrase "you may take *such condition* into consideration" to refer to "intoxication."  Maj. op. at 14.  Instead, the majority claims that Drinkard's jury must have interpreted "such condition" to refer to "temporary insanity caused by intoxication." Maj. op. at 14.  As an initial matter, I find it hard to believe that Drinkard's jury must have interpreted the referent in question to refer to a phrase that is not even present

in the sentence of the instruction at issue.[26]  Even putting grammatical semantics aside, I find it entirely unclear whether the term "such condition" in the instruction refers to "temporarily insane," to "intoxication," or to the entire phrase "temporarily insane as a result of intoxication."

The majority's analysis stands at odds both with plain language interpretations of the statute from which the instruction was derived and with plain language interpretations of nearly identical instructions given in other cases.  The focus of § 8.04 of the Texas Penal Code is on voluntary intoxication in general. Accordingly, the Texas Court of Criminal Appeals has stated explicitly that the *statutory language* of § 8.04(b) restricts the circumstances under which evidence of intoxication may be considered mitigating evidence.  *See Cordova v. State*, 733 S.W.2d 175, 189 (Tex.Cr.App. 1987), *cert. denied*, 487 U.S. 1240 (1988) ("In Texas, voluntary intoxication is no defense to the commission

---

[26]     The relevant sentence in the instruction reads, "Therefore, if you find that the defendant . . . was *temporarily insane as a result of intoxication*, then you may take *such condition* into consideration . . . ."  The grammatical definition of an antecedent is "a word, phrase, or clause, usually a *substantive*, that is replaced by a pronoun usually at a later point."  RANDOM HOUSE COLLEGE DICTIONARY 56 (1980) (emphasis added).  The word "insane" in the above-quoted sentence does not serve as a substantive (i.e., noun), but rather as an adjective.  Consequently, the term "temporarily insane as a result of intoxication" is not a substantive phrase, but an adjectival phrase.  If we analyze the sentence in the strictest grammatical sense, the only substantive "condition" in the instruction to which "such condition" could properly refer is the noun "intoxication."  The majority avoids this obstacle, for purposes of its grammatical analysis, by substituting the phrase "temporary insanity caused by intoxication," the term that is used in the first sentence of the instruction, for the phrase "temporarily insane as a result of intoxication," the term that is used in the sentence relevant to the referent "such condition."

-47-

of a criminal wrong.  However, such may become mitigating evidence to the penalty attached to the offense for which the defendant is being tried if the intoxication caused temporary insanity.") (internal citations omitted).

It is therefore not surprising that *every* published opinion interpreting the plain language of an instruction given pursuant to § 8.04(b), with the exception of that propounded by the majority today, has concluded that the instruction forecloses the jury's consideration of evidence of intoxication unless such intoxication renders the defendant temporarily insane:

> While our penal code specifically precludes voluntary intoxication as a defense to the commission of crime, mitigation of punishment is possible, but only where the level of intoxication produces temporary insanity in the defendant. . . .
>     . . .
> Although appellant was not prevented from introducing mitigating evidence, the above instruction required the jury to find her intoxication at the time of the killings rendered her temporarily insane before they could consider her drug use in mitigation of her punishment.  The charge on its face instructed the jury to consider the mitigating evidence only in this light, thereby implying that it may not have been considered for any other purpose.

*Tucker v. State*, 771 S.W.2d 523, 533-34 (Tex.Cr.App. 1988), *cert. denied*, 492 U.S. 912 (1989).

> [T]his instruction does not even purport to empower the jury to give mitigating effect to evidence of voluntary intoxication that does not rise to the level of temporary insanity.  A juror who believed a capital accused was not so intoxicated as to be incapable of appreciating the wrongfulness of his action might nevertheless find him less morally culpable than would have been a sober man

> committing the same crime. Here the juror would have no
> way to effectuate this belief either.

*Ex Parte Rodgers*, 819 S.W.2d 533, 537 (Tex.Cr.App. 1991) (Clinton,

J., dissenting, joined by Baird and Maloney, JJ.).[27]

> We do not reach the merits of the argument that the
> instruction denied Rogers his constitutionally secured
> right to have the jury consider all of his relevant
> mitigating evidence. . . . The jury was allowed to
> consider evidence of voluntary intoxication as mitigating
> if it was persuaded that Rogers was so intoxicated that
> he did not know that what he was doing was wrong. . . .
> Here, the jury was allowed to give effect to intoxication
> evidence *but only at the defined level*. The
> instruction's fit with *Johnson* and *Eddings v. Oklahoma*,
> 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), is
> uncertain, and we suggest no answer to that question
> today.

*Rogers v. Scott*, 70 F.3d 340, 343-44 (5th Cir. 1995), *cert. denied*,

___ U.S. ___, 116 S. Ct. 1881 (1996) (emphasis added).[28]

> My dissent is not based on the operation of the
> statutory special issues in isolation in Nethery's case;
> instead, it is based on another instruction that the
> trial court submitted along with the special issues that,
> in effect, took all three of the special issues out of
> operation with respect to Nethery's evidence of
> intoxication. . . .
> A reasonable juror could read that instruction as
> providing that Nethery's evidence of intoxication *could
> not be considered at all*))*including under the special*

---

[27]     The majority in *Ex Parte Rodgers* did not undertake an interpretation of the § 8.04(b) instruction. Unlike Drinkard, the petitioner in *Ex Parte Rodgers* did not object to the trial court's jury charge, and the per curiam opinion disposed of all of the petitioner's claims by finding "that the findings and conclusions entered by the trial court are supported by the record and upon such basis the relief sought is denied." *Ex Parte Rodgers*, 819 S.W.2d at 534.

[28]     Unlike Drinkard, the petitioner in *Rogers* did not object to the § 8.04(b) instruction given at the punishment phase of his trial. We thus held his Eighth Amendment claim procedurally barred. 70 F.3d at 343-44.

*issues*))unless Nethery was so intoxicated that he was rendered temporarily insane. . . .

. . . Because Nethery's jury was entirely precluded from considering the evidence of his non-insane state of intoxication, I believe that the § 8.04 instruction given by the trial judge in Nethery's case was a straight-forward violation of this well-established Eighth Amendment principle.

*Nethery v. Collins*, 993 F.2d 1154, 1163-65 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 1416 (1994) (King, J., dissenting).[29]

Perhaps most troubling about the majority's reading of the § 8.04(b) instruction in Drinkard's case is the fact that the State's brief *concedes* that instructions given pursuant to § 8.04(b) foreclose jurors' consideration of evidence of intoxication not rising to the level of temporary insanity:

Texas law permissibly *limits the circumstances under which voluntary intoxication can be given mitigating effect to those instances in which it renders the defendant unable to determine right from wrong* or incapable of conforming his conduct to the law. . . .
By *requiring that voluntary intoxication result in temporary insanity*, as defined by state law, Texas properly restricts the jury's consideration of mitigating evidence to those circumstances in which the intoxication actually results in a reduced culpability.

Respondent-Appellee's Opposition to Application for Certificate of Probable Cause, at 24-25 (emphasis added).[30]

---

[29] The majority in *Nethery* expressly declined to address the merits of the constitutionality of the § 8.04(b) instruction, holding the claim procedurally barred. *Nethery*, 993 F.2d at 1161 n.26.

[30] Instead of arguing that the instruction does not foreclose consideration of evidence of intoxication not rising to the level of temporary insanity, the State's brief argues that such evidence is not constitutionally

In addition to the assertions of the State in its briefs and at trial, and in addition to the weight of precedent, common sense also dictates that the § 8.04(b) instruction in Drinkard's case "clearly directed the sentencer to disregard evidence." *Boyde*, 494 U.S. at 384, 110 S. Ct. at 1200. Although the § 8.04(b) instruction in Drinkard's case did not explicitly prohibit jurors from considering evidence of lower-level intoxication, the Supreme Court has held that an instruction telling a jury what it "may" consider necessarily implies that it may not consider other factors. This truism is embodied in the ancient legal maxim *expressio unius est exclusio alterius*, the expression of one thing is to the exclusion of another.

The Supreme Court in *Hitchcock v. Dugger* endorsed exactly that inferential step, finding that "it could not be clearer" that, by instructing advisory jurors that they could consider evidence of certain statutory factors, a trial judge instructed them that they could not consider evidence of other, nonstatutory factors. *Hitchcock*, 481 U.S. 393, 398-99, 107 S. Ct. 1821, 1824-25, L. Ed. 2d 347 (1987), *vacated on other grounds*, ___ U.S. ___, 112 S. Ct. 3020 (1992). The rationale of *Hitchcock* supports an interpretation of the § 8.04(b) instruction in Drinkard's case))which affirmatively stated which evidence of intoxication jurors "may"

relevant. As the majority acknowledges, evidence of intoxication at the time of the murders is clearly constitutionally relevant. Maj. op. at 11 n.10.

consider))as "clearly directing" jurors not to consider evidence of intoxication not resulting in insanity.

In light of the overwhelming number of § 8.04(b) interpretations))from the parties, from members of this Court, and from Texas state courts))to reach conclusions opposite that of the majority, I do not accept the majority's unsupported conclusions regarding the plain language of the § 8.04(b) instruction in Drinkard's case.

## II

The majority next holds that the trial court's general instruction directing the jury to "consider all the evidence" remedied any infirmity in the more specific § 8.04(b) instruction. However, the Supreme Court has held that such a contradictory, permissible instruction in a jury charge will not cure an otherwise constitutionally impermissible instruction:

> Nothing in these specific sentences or in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other. Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.

*Francis v. Franklin*, 471 U.S. 307, 322, 105 S. Ct. 1965, 1975, 85 L. Ed. 2d 344 (1985). The majority sidesteps this issue by suggesting that the two instructions are not at odds))that there is no reasonable likelihood that Drinkard's jury interpreted the trial

court's general instruction and the § 8.04(b) instruction to contradict each other. In light of both common sense and relevant case law, I find such an analysis untenable.

There is more than one way that Drinkard's jury could have interpreted the general instruction and the § 8.04(b) instruction to "contradict" each other. The jury could have, of course, interpreted the general instruction to mean "Do consider evidence of lower-level intoxication," while interpreting the § 8.04(b) instruction to mean "Do not consider evidence of lower-level intoxication." The jury could have interpreted the general instruction as constituting the general rule and interpreted the § 8.04(b) instruction to carve out a specific exception. Further, the jury could have squared the two instructions through textual analysis. The general instruction directs jurors that they may consider all of the evidence "in determining each of these Special Issues." Consistent with this instruction, the jury could have considered all of Drinkard's evidence of intoxication, but only for the purpose of determining whether such evidence rose to the level of temporary insanity. Thus, the jury could have considered such evidence *in the process* of determining the answers to the special issues, but still could have considered themselves foreclosed from considering evidence of lower-level intoxication *in mitigation* of punishment, pursuant to the § 8.04(b) instruction. This

interpretation renders the instructions facially complementary, though clearly unconstitutional.

I do not proffer any of these interpretations as the "correct" interpretation of the jury charge in Drinkard's case, nor do I claim that any one interpretation is the most likely. Such claims are not what the law requires. I present these possible interpretations in order to illustrate the uncertainty surrounding the relationship between these two instructions.

Simply put, no language in either the general instruction or the § 8.04(b) special instruction given in Drinkard's case provides any indication of how the two instructions should relate to each other. This sense of uncertainty was explicitly recognized by another panel of our Court when describing an essentially identical jury charge:

> The trial judge did not explicitly instruct the jury whether it could consider the evidence of intoxication in answering the two questions. It did instruct that the jury could consider all evidence submitted during both the guilt and punishment phases of the trial, and, significantly, counsel argued the weight the jury ought to accord to the intoxication evidence. Nonetheless, we cannot say with confidence how the jury put the instruction and the questions together. We are describing the uncertainty because it is the context in which the procedural bar was invoked.

*Rogers*, 70 F.3d at 344. We simply do not know how Drinkard's jury put these instructions together. In the face of such uncertainty, I do not accept the majority opinion's unsupported assertion that "[t]his general instruction necessarily and undeniably directed the

jury to consider Drinkard's evidence of intoxication in answering the special issues."  Maj. op. at 16.[31]

## III

Third, the majority holds that the § 8.04(b) instruction by its own terms applied to only the first special issue, concerning whether the murder was committed deliberately.  Therefore, the argument continues, the instruction could not have foreclosed jurors' consideration of Drinkard's evidence of intoxication with regard to the second special issue, involving future dangerousness. This portion of the majority's analysis is flawed in several respects.

The majority's analysis is exactly the type of "technical hairsplitting" that the Supreme Court has repeatedly warned us not to perform when analyzing challenged instructions under the "reasonable likelihood" standard:

> In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would))with a "commonsense understanding of the instructions in the light of all that has taken place at trial."

---

[31]    More importantly, the Supreme Court disagrees.  As I have previously noted, *Hitchcock v. Dugger* supplies the inferential step that the majority ignores))"it could not be clearer" that, by instructing advisory jurors that they could consider evidence of certain statutory factors, a trial judge instructed them that they could not consider evidence of other, nonstatutory factors. *See, supra* at 9 (citing *Hitchcock*, 481 U.S. at 398-99, 107 S. Ct. 1824-25).

*Johnson v. Texas*, 509 U.S. 350, 368, 113 S. Ct. 2658, 2669, 125 L. Ed. 2d 290 (1993) (quoting *Boyde*, 494 U.S. at 381, 110 S. Ct. at 1198).

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde*, 494 U.S. at 380-81, 110 S. Ct. at 1198. The majority quotes the language "at the time of the commission of the offense" in one clause of the § 8.04(b) instruction, uses that language to impose a temporal restriction on the whole instruction, draws a distinction between the "backward-looking" first special issue and the "forward-looking" second special issue, and concludes that the jurors must have fenced off the second special issue as a safe haven, a sort of limitation-free zone, for the consideration of evidence of voluntary intoxication. This portion of the majority opinion provides a perfect illustration of a court "parsing instructions for subtle shades of meaning in the same way that lawyers might."

Even parsing the instructions, I still do not reach the majority's conclusions. Breaking down the language and grammar of the § 8.04(b) instruction given in Drinkard's case provides no support for the majority's conclusion that the instruction affects

only the first special issue. The relevant portion of the instruction is a conditional sentence, following an "if/then" structure:

> *[I]f* you find that the defendant at the time of the commission of the offense for which he is on trial was temporarily insane as a result of intoxication, *then* you may take such condition into consideration in mitigation of penalty attached for the offense for which the defendant is being tried.

The word "if" signals the condition of the sentence, the word "then" signals the contingency. Both parts of the instruction have temporal components. The condition ("If you find . . .") is a future condition; it will be realized, if at all, in the jury room. However, this future condition is restricted in time, because the direct object of the future verb "find" is a dependent clause with a past tense verb ("was [temporarily insane]"). Likewise, the contingency ("then you may . . .") is a future contingency; it will occur, if at all, in the jury room. However, the contingency of the instruction contains no language that restricts its scope to "at the time of the commission of the offense," or any other past framework. Restating the instruction using symbols, the jury was thus instructed "If you find (in the future) that x occurred (in the past), then you may do y (in the future)." Any restriction on the application of the instruction would have to appear in the contingency ("then you may . . ."), which directs the jury how to apply certain evidence, not in the condition ("If you find . . ."),

which only identifies the circumstances under which the contingency will be realized.

When reduced to its basic elements, the majority's analysis states that language in the "If you find . . ." part of the instruction imposes a temporal restriction on the "then you may . . ." contingency. Such a thesis is contrary to common sense and unsupported in the language of the instruction. I do not find the words "only with regard to the first special issue" implicit in the language "you may take such condition into consideration in mitigation of penalty attached for the offense for which the defendant is on trial."

The majority's position is also directly contrary to the arguments of the State's attorneys. For if the jury's findings as to "backward-looking" events were relevant only to the "backward-looking" special issue, jurors could not use past events to predict future behavior. As Mr. Millin argued for the State:

> The second issue involves whether or not you find that there's a probability that Mr. Drinkard will commit future acts of violence, criminal acts of violence, such that they would be or he would be a continuing threat to society. In this regard, as I'm sure you discussed on the voir dire process, that basically the best way))the only way that a person can predict another's future conduct is based on his past conduct. We have to prove beyond a reasonable doubt that there's such a probability that this person will act in the future as he's acted in the past because we would never be able to prove to a 100 percent certainty.

Trial transcript, vol. 36, at 25-26.  Therefore, both in terms of grammar, technically parsed in the most legalistic sense, and in terms of common sense, no language in the challenged instruction directs jurors to cabin the effect of the instruction within the first special issue.

The majority is quite right to point out that challenged instructions should be analyzed in the context in which they are made.  *Cupp v. Naughten*, 414 U.S. 141, 146-47, 94 S. Ct. 396, 400, 38 L. Ed. 2d 368 (1973).  The majority is also correct to consider the arguments of Drinkard's attorneys as part of that context.  *Boyde*, 494 U.S. at 384-85, 110 S. Ct. at 1200.  Both of Drinkard's attorneys did argue, quite forcefully, that the jury should consider the fact that Drinkard was intoxicated at the time of the murders when deciding both of the special issues.  However, the majority's analysis in this regard is remiss in two respects.

First, while the arguments of counsel are relevant a jury's interpretation of challenged jury instructions, the court's instructions themselves carry substantially more weight.  *Boyde*, 494 U.S. at 384-85, 110 S. Ct. at 1200.  Therefore, an attorney's arguments to the jury are simply insufficient to cure an otherwise unconstitutional instruction given by the court.  *Taylor v. Kentucky*, 436 U.S. 478, 488-89, 98 S. Ct. 1930, 1936, 56 L. Ed. 2d 468 (1978).

Second, if the majority opinion is to rely on a contextual analysis, it must look at the challenged instruction in the context of "all that has taken place at trial," *Boyde*, 494 U.S. at 381, 110 S. Ct. at 1198, not just those parts of the proceedings that support the majority's conclusions. A review of the trial court record reveals that Drinkard's intoxication evidence was a central issue. At the guilt-innocence phase of the trial, Drinkard presented evidence that he was intoxicated at the time of the murders. However, at the close of the guilt-innocence phase, the trial court specially instructed the jury that voluntary intoxication does not constitute a defense to the commission of a crime under Texas law. The message of the § 8.04(a) instruction was clear: Intoxication evidence is simply not relevant.

At the penalty phase of the trial, Drinkard once again presented evidence that he was intoxicated at the time of the murders. At the close of evidence the State waived its right to open closing arguments. Drinkard's attorneys then argued that the jury could answer both special issues "no" based on the intoxication evidence. They argued, with regard to special issue number one, that Drinkard did not act deliberately because at the time of the murders he had been intoxicated to the point of temporary insanity; he did not know right from wrong. Then they argued, with regard to special issue number two, that Drinkard would not be dangerous in the future because he was dangerous only

when he was drunk, and he would not be able to drink while incarcerated. As support for this argument, Drinkard's attorneys pointed to evidence concerning his intoxication during violent episodes in his past, including the murders for which Drinkard was on trial. As the majority opinion details, however, these arguments with regard to the second special issue did not focus on intoxication to the point of temporary insanity, but instead focused on intoxication generally, necessarily including evidence of lower-level intoxication.

In the State's closing argument, Mr. Millin made two direct references to the trial court's § 8.04(b) instruction. Neither reference limits itself to the first special issue. Indeed, in the portion of Mr. Millin's argument quoted by the majority in a footnote, the State suggests explicitly that temporary insanity is a prerequisite to the consideration of intoxication evidence under both special issues:

> The Defense talks to you about this issue of temporary insanity due to intoxication, and I suppose that comes in mostly))*they connected up somehow with both special issues*, but to consider that *at all*))and I suggest after you look at the evidence you won't consider that *at all*. To consider that *at all* you have to decide, one, that at the time of the deaths Mr. Drinkard was intoxicated. . . . and, two, *that by reason of this voluntary intoxication he didn't basically know right from wrong*, he didn't know what he was doing when he killed these three people was wrong.

Trial transcript, vol. 36, at 22-23 (emphasis added); *see also* Trial transcript, vol. 36, at 25 ("He wasn't intoxicated to such an

extent he didn't know right from wrong.  That's what you have to find to give him *any kind of break on the intoxication*.") (emphasis added).  That is the context in which Drinkard's jury heard the trial court's jury charge.  That is the context in which Drinkard's jury heard a general instruction to "consider all the evidence submitted to you," and a special instruction, which concluded:

> [I]f you find that the defendant at the time of the commission of the offense for which he is on trial was temporarily insane as a result of intoxication, then you may take such condition into consideration in mitigation of penalty attached for the offense for which the defendant is being tried.

In my opinion, the message of the § 8.04(b) instruction))especially in light of the § 8.04(a) instruction given earlier))is clear: Intoxication evidence is relevant only under the defined circumstances.

The majority today holds that there is no reasonable likelihood that Drinkard's jury felt precluded by the instructions of the court from considering Drinkard's proffered evidence of intoxication not rising to the level of temporary insanity.  In so doing, the majority concludes that there is *no reasonable likelihood* that Drinkard's jury interpreted the § 8.04(b) special instruction as the State's attorneys interpret it, as Texas courts have interpreted it, and as several members of our Court have previously interpreted it.  In the full context of this trial, I find that such misinterpretation was reasonably likely.

Finally, because the majority would decide this case on the alternative ground that the recently passed Antiterrorism and Effective Death Penalty Act ("AEDPA") would deny habeas relief, I briefly address this issue as well. During the pendency of this appeal, the President signed into law the AEDPA, which (among other things) amends federal habeas corpus law. This new law narrows the circumstances under which federal courts may grant writs of habeas corpus on behalf of people held under judgment of state courts. The state court's temporary insanity instruction and subsequent decision so clearly denied Drinkard the constitutional guarantees of *Lockett* and *Eddings*, however, that habeas relief is justified even under the AEDPA.

The relevant section of the habeas corpus statute, 28 U.S.C. § 2254(d)(1), as amended by AEDPA § 104(3)(d), states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ))
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

Because Congress included neither an effective date for this amended provision nor a clear statement regarding its retroactive application to cases pending on appeal, it is not apparent whether

we should apply the AEDPA in this case. As an initial matter, I agree with the majority's careful analysis and conclusions that the statute is a procedural change in the standard of review, and that as such it should have retroactive effect under *Landgraf v. USI Film Products*, ___ U.S. ___, ___, 114 S. Ct. 1483, 1499-1505, 128 L. Ed. 2d 229 (1994), and *United States v. Mejia*, 844 F.2d 209, 211 (5th Cir. 1988). I also agree with the majority's determination that the state court decided Drinkard's claims on the merits. Maj. op. at 29-33, 36-37. However, as to the majority's substantive application of the AEDPA and its ultimate decision on the merits of Drinkard's habeas petition, I respectfully disagree.

A

The majority reviews the state court's determinations of law separately from mixed questions of law and fact. It holds that, as a matter of law, the trial court's correct identification of the applicable constitutional standard guarantees that the state court's decision was not contrary to clearly established federal law. Although the state court apparently recognized that a sentencing judge may not bar a jury from considering any relevant evidence, § 2254(d)(1) directs us to consider a different issue. Under the AEDPA, we must consider whether the state court's adjudication "resulted in a *decision* contrary . . . to clearly established Federal law . . . ." (emphasis added). It is plain that identification of the proper standard is not enough; the state

court's *decision* must accord with the Supreme Court's interpretation of the Constitution. For the reasons I have stated above, I think it is clear that the effect of the trial court's § 8.04(b) instruction was to bar the jury's consideration of mitigating evidence. Thus the trial court's decision was contrary to the Supreme Court's interpretation of the Eighth Amendment in *Lockett* and *Eddings*.

B

The majority also holds that, as a mixed question of law and fact, the state court did not unreasonably apply federal law in determining that its limiting instruction did not violate the Eighth Amendment. Specifically, the majority bases its reasoning on the principle that the AEDPA's "'unreasonable application' standard of review of a state court decision must mean more than that a federal court may grant habeas relief based on its simple disagreement with the state court decision; this would amount to nothing more than a *de novo* review." Maj. op. at 38.

I think the majority has the standard of review exactly wrong. The Supreme Court has consistently held that application of constitutional law to facts in habeas cases requires an independent, *de novo* determination by federal courts. *Wright v. West*, 505 U.S. 277, 301-03, 112 S. Ct. 2482, 2495-96, 120 L. Ed. 2d 225 (1992) (O'Connor, J., concurring) (the Supreme Court has consistently applied a *de novo* standard of review in mixed

questions of constitutional law and fact in habeas corpus cases); *see also Brown v. Allen*, 344 U.S. 443, 507, 73 S. Ct. 397, 446, 97 L. Ed. 469 (1953), *overruled on other grounds by Townsend v. Sain*, 372 U.S. 293, 312 (1963) ("Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge."); *Irvin v. Dowd*, 366 U.S. 717, 723-28, 81 S. Ct. 1639, 1643-45, 6 L. Ed. 2d 751 (1961) (reviewing *de novo* state court determinations of mixed questions of law and fact in federal habeas case); *Brewer v. Williams*, 430 U.S. 387, 403, 97 S. Ct. 1232, 1242, 51 L. Ed. 2d 424 (1977) (same); *Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S. Ct. 1708, 1715, 64 L. Ed. 2d 333 (1980) (same); *Miller v. Fenton*, 474 U.S. 104, 112, 106 S. Ct. 445, 450, 88 L. Ed. 2d 405 (1985) (same). The Supreme Court has made clear that federal courts must undertake independent, *de novo* review of state court habeas decisions on appeal. I am unwilling to depart from this unbroken line of Supreme Court precedent, especially since the language of § 2254(d)(1), as amended, does not demand it.[32]

---

[32]   For this unprecedented deferential standard of review, the majority cites only the word "unreasonable" in § 2254(d)(1) and one piece of legislative history, indicating that the AEDPA "requires deference to the determinations of state courts that are neither 'contrary to,' nor an 'unreasonable application of,' clearly established federal law." H.R. Conf. Rep. No. 518, 104th Cong., 2d Sess. 111 (1996), *reprinted in* 1996 U.S.C.C.A.N. 944, 944. This statement in the conference report does not change the standard of review, it merely restates the standard of the AEDPA, dictating that we should not upset state court decisions that do not offend federal constitutional law. I would not overturn established Supreme Court precedent with so thin a lever.

The majority continues by stating that an application of law to facts is unreasonable only where "reasonable jurists would be of one view that the state court ruling was incorrect." This cannot be the standard of review. Where a federal court of appeals determines that a state criminal decision is contrary to federal law, § 2254(d)(1) does not require the unanimous consent of the federal bench for habeas relief. Indeed, it does not even require unanimity among a panel of judges considering the case. The determination of reasonableness must consider only the propriety and correctness of the state court's actions in the context of federal guarantees established by the Supreme Court. If a federal court "disagrees" with the state court's application of federal law))if it finds that the state court unreasonably applied the law of the land))that federal court must grant habeas relief under § 2254(d)(1). It is well established that where state and federal courts disagree about the meaning of federal law, the interpretation of the federal courts must prevail. *Brown*, 344 U.S. at 507, 73 S. Ct. at 446.

As I have catalogued in this dissent, I think it clear that the state court's temporary insanity instruction denied Drinkard the constitutional guarantees of *Lockett* and *Eddings*. The misapplication of the Eighth Amendment to the facts of this case justify relief under § 2254(d)(1), whether or not we apply the

AEDPA. Thus I respectfully disagree with the majority's conclusions, and, accordingly, I dissent.