**Aua LAUTI, Petitioner–Appellee,**

**v.**

**Gary JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent–Appellant.**

No. 96–20003.

United States Court of Appeals,
Fifth Circuit.

Dec. 13, 1996.

---

Ken J. McLean, Houston, TX, Roy G. Romo, Houston, TX, for petitioner-appellee.

Dana Emmert Parker, Assistant Attorney General, Margaret Portman Griffey, Office of the Attorney General for the State of Texas, Austin, TX, for respondent-appellant.

Before JOLLY, JONES and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The principal issue in this appeal is the same as that decided by a panel of the court only two months ago: whether a Texas jury instruction concerning intoxication, Tex.Penal Code § 8.04(b), unconstitutionally prevented the jury from considering that benumbed state as mitigating evidence even if it did not rise to the level of temporary insanity. As the court concluded in *Drinkard v. Johnson*, 97 F.3d 751 (5th Cir.1996), the instruction is not unconstitutional.[1] It follows that the district court decision holding otherwise in this case must be reversed. Writ relief is denied to petitioner Lauti.

## BACKGROUND FACTS

In September 1986, appellee Aua Lauti was convicted of the capital offense of murder during the course of an aggravated sexual assault and kidnapping. The State's evidence was that one evening the previous December, Lauti went to the home of his uncle, who lived with his wife and their four young children, Lauti's cousins. By the time Lauti arrived at his uncle's home, it was obvious that he had been drinking and was intoxicated. After visiting with his uncle, Lauti told his uncle that he was going home. Instead of going home, Lauti apparently indulged in more drink. Before the evening's end, Lauti had consumed at a minimum two twelve-packs of beer and four quarts of malt liquor.

Five or ten minutes after leaving his uncle's home the second time, Lauti returned unexpectedly and either went to sleep or pretended to sleep in one of the bedrooms. After finding Lauti apparently asleep, the uncle took his two oldest daughters and drove approximately four miles to Lauti's parents' house (the uncle's sister and brother-in-law) to have Lauti's family retrieve him from his uncle's home. Upon returning, the relatives discovered that Lauti was gone;

---

1. *Drinkard* also held that, applying the recently enacted standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996), the state courts did not unreasonably interpret a § 8.04(b) instruction. Without repeating that analysis here, we note that *Drinkard* controls on these points as well.

also missing was the uncle's nine year-old daughter, Tara, Lauti's cousin.

Lauti's parents and brother began searching and found Lauti several miles away. After being quizzed, Lauti directed his parents and brother to Tara, whom they found at a location described by Lauti. She was covered with mud, her face was bruised and bleeding, and she was naked from the waist down. They transported Tara to Lauti's uncle's house where it was determined that Tara was dead. She died from three injuries, any one of which would have been sufficient to kill her: a skull fracture, asphyxiation due to strangulation, and a crushed chest.

After being arrested and informed of his legal rights, Lauti gave a written statement to the authorities (which was presented to the jury) in which he described the murder in detail. He admitted abducting Tara from her home after knocking her unconscious by hitting her in the head with his fist. He then took her into his car where she regained consciousness while he was driving, and he again knocked her unconscious with an empty quart malt liquor bottle. After reaching a location that suited him, he carried her into a field where he hit her in the chest with his fist, removed her clothes from the waist down, and digitally penetrated her vagina. He then attempted unsuccessfully to rape her. At that point, he hit her in the chest again with his fist, choked her with his hands for about five minutes, and left her in the field.

The jury convicted Lauti of capital murder. At the sentencing phase of his trial, the jury heard testimony that in 1975 Lauti was convicted in Hawaii of first degree rape in which he had also beaten his victim while high from sniffing paint. The jury also learned that in 1981 Lauti threatened motorists and a Honolulu Police Department officer with a machete while apparently "under the influence of paint."

When the trial court charged the jury during the sentencing phase of his trial, the court stated, pursuant to TEX.PENAL CODE ANN. § 8.04(b):

Evidence of temporary insanity caused by intoxication may be introduced by the defendant in mitigation of the penalty attached to the offense for which he is being tried.

Intoxication means disturbance of mental or physical capacity resulting from the introduction of any substance into the body. Temporary insanity caused by intoxication means that the defendant's mental capacity was so disturbed from the introduction of a substance into his body that the defendant did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated.

After the jury affirmatively answered the two special issues,[2] the court sentenced Lauti to death.

After direct appeal and a state habeas action, Lauti filed a petition for federal habeas relief. The district court granted the writ, ruling that, in violation of Lauti's constitutional rights, the § 8.04(b) instruction, *supra*, prevented the jury from considering intoxication—other than intoxication rising to the level of temporary insanity—in mitigation of a death sentence. The court also ruled that because Lauti's trial attorney failed to object to that instruction, Lauti received ineffective assistance of counsel in violation of the sixth amendment. The state timely appealed.

## DISCUSSION

 In reviewing a district court's grant of habeas relief, we review factual findings for clear error and issues of law *de novo*. *See Dison v. Whitley*, 20 F.3d 185, 186 (5th

2. The special issues presented to the jury, pursuant to TEX CODE CRIM.PROC.ANN art. 37.071(b) (Vernon 1981), were:

(1) Was the conduct of the defendant, Aua Lauti, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

(2) Is there a probability that the defendant, Aua Lauti, would commit criminal acts of violence that would constitute a continuing threat to society?

R.Tr. IV at 1074–75.

Cir.1994). Mixed questions of law and fact are reviewed *de novo* by independently applying the law to the facts found by the district court, unless those factual determinations are clearly erroneous. *See Gray v. Lynn,* 6 F.3d 265, 268 (5th Cir.1993).

In *Drinkard v. Johnson, supra,* this court was presented with the issue whether a Texas court's jury instruction during the sentencing phase of a capital murder trial quoting § 8.04(b) of the Texas Penal Code unconstitutionally prevents the jury from giving mitigating effect to evidence of the defendant's intoxication not rising to the level of temporary insanity. *See Drinkard,* 97 F.3d at 754. *Drinkard* concluded that the court's charge pursuant to § 8.04(b) did not violate the defendant's constitutional rights. *See id.*

■ Lauti argues—as did the appellant in *Drinkard*—that the § 8.04(b) instruction prevented the jury from considering and giving mitigating effect to evidence of his intoxication if it did not rise to the level of temporary insanity. *See id.* at 756. In analyzing Drinkard's claim, we stated that:

> [t]he proper standard for reviewing a challenged jury instruction in the capital sentencing context is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. This reasonable likelihood standard does not require the petitioner to prove that the jury more likely than not interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than only a possibility of an impermissible interpretation.

*Id.* at 757 (quoting *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990)) (citations and quotations omitted).

■ It is this court's task to ensure that all relevant evidence that Lauti submitted in mitigation of a death sentence was within the effective reach of the jury so that the jury had some opportunity to consider that evidence and give to it whatever mitigating effect the jury deemed appropriate. *See*

*Drinkard,* 97 F.3d at 764; *see also Johnson v. Texas,* 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993) (it is constitutionally permissible for the State to guide the sentencer's consideration of mitigating evidence in a capital trial). With this in mind, we consider (1) the language of the challenged instruction, (2) the court's instruction to the jury as a whole, and (3) the interplay between the challenged instruction and the special issues that the jury was required to answer in order to ascertain whether Lauti's evidence of intoxication was within the effective reach of the jury. *See Drinkard,* 97 F.3d at 758–64.

In an instruction virtually identical to that in *Drinkard,* the court charged Lauti's jury:

> Evidence of temporary insanity caused by intoxication may be introduced by the defendant in mitigation of the penalty attached to the offense for which he is being tried.

> Intoxication means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

> Temporary insanity caused by intoxication means that the defendant's mental capacity was so disturbed from the introduction of a substance into his body that the defendant either did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated.

R.Tr. IV at 1070. *See Drinkard,* 97 F.3d at 758 (quoting the challenged instruction). For the same reasons discussed in detail in *Drinkard,* this instruction does not place consideration of non-insane intoxication beyond the effective reach of the jury. *See id.* at 758–59. To the extent that non-insane intoxication may be mitigating, a dubious proposition in itself, we cannot say that there is a reasonable likelihood that the jury as a whole, with differences in interpretation thrashed out in the deliberative process, construed this instruction as precluding consideration of such intoxication. *See id.* at 759.

Immediately before reading the challenged instruction, the trial court charged the jury to consider *all* of the evidence presented to it in determining Lauti's sentence:

You are further instructed that in determining each of these Special Issues, you may take into consideration *all of the evidence* submitted to you in the full trial of the case, that is, *all of the evidence* submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and *all of the evidence,* if any, admitted before you in the second part of the trial wherein you are called upon to determine the answers to Special Issues hereby submitted to you.

R.Tr. IV at 1070 (emphasis added). This general instruction directed the jury to consider all evidence of Lauti's intoxication in answering the special issues. *See Drinkard,* 97 F.3d at 760. "The fact that the charge included this affirmative instruction to consider *all* the evidence strongly supports our conclusion that there is not a reasonable likelihood that the jury understood the instructions, as a whole, as precluding consideration of non-insane intoxication." *See id.* (emphasis in original).

Finally, as in *Drinkard,* the argument of counsel during the sentencing phase of Lauti's trial emphasized to the jury that it could and should consider all evidence of Lauti's intoxication in sentencing him. *See id.* at 763–64. Both the State and defense counsel presented brief closing arguments. In his closing argument, Lauti's counsel told the jury:

At this particular point in the trial, I speak to you, as the Judge read to you as he brought you the charge; *where we are dealing with the issue of intoxication; not as a defense, but as a mitigation. Now intoxication can be taken into consideration by the jury to decide.*

R. S.F. at 876 (emphasis added).

We are talking about this man right here and what alcohol did to him, what that alcohol, that amount—the State says that is not a defense. *But one takes it into consideration, whether it was a deliberate act in contravention of what society believes is right or wrong . . . .*

Because of the intoxication he couldn't conform to our society—to our society. R. S.F. at 879 (emphasis added). Through these words, the jury was informed and encouraged to consider evidence of Lauti's intoxication in mitigation of a death sentence. Defense counsel's arguments would have led the jury to believe that it could consider *any* evidence of Lauti's intoxication—not just intoxication rising to the level of temporary insanity—in mitigation of capital punishment. *See Drinkard,* 97 F.3d at 763–64. The prosecutor did not challenge the relevance of Lauti's intoxication on the Texas punishment issues of deliberateness and future dangerousness. He contended that the evidence of intoxication supported affirmative answers to the questions. Neither side, in other words, treated the § 8.04(b) instruction as an exclusive vehicle for assessing the mitigating impact of intoxication evidence.

Based on the similarity of the jury instructions here and in *Drinkard* and on the way the instructions were explained to the jury, we reject the district court's analysis and uphold the intoxication instruction.

The district court also found that Lauti's counsel was constitutionally deficient because he failed to object to the § 8.04(b) instruction. As we have approved the jury instruction, the ineffectiveness claim necessarily falls.

## CONCLUSION

For the foregoing reasons, we REVERSE the decision of the district court granting habeas relief and VACATE the district court's order staying execution.