Barbara Jo ARCHIE, Petitioner,

v.

**Wendy HOBBS, Respondent.**

**Civil Action No. 96–0469–R.**

United States District Court,
W.D. Virginia,
Roanoke Division.

Feb. 5, 1997.

---

**1150**

Michael Morchower, Morchower, Luxton & Whaley, Richmond, VA, for Barbara Jo Archie.

Linwood Theodore Wells, Jr., Office of the Attorney General, Richmond, VA, for Wendy Hobbs.

### *Memorandum Opinion*

KISER, Chief Judge.

Petitioner Barbara Jo Archie, by counsel, has filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner contends that her criminal conviction for first degree murder in the Circuit Court of Giles County is constitutionally infirm because her attorney at trial rendered ineffective assistance of counsel in that he failed to investigate certain factual defenses or to present character witnesses. The respondent, through counsel, filed a motion to dismiss. Although petitioner has not responded to this motion, sufficient time has passed that the motion is now ripe for consideration.

On July 22, 1990, a jury convened by the Circuit Court of Giles County found petitioner guilty of first degree murder and recommended a sentence of life imprisonment. On September 25, 1990, the court entered judgment against petitioner and imposed the sentence recommended by the jury. Petitioner did not succeed in her direct appeals of this judgment to the Court of Appeals of Virginia and to the Supreme Court of Virginia. On April 20, 1994, petitioner filed a petition for writ of habeas corpus in the Circuit Court of Giles County. She raised substantially the same, if not the identical, grounds for relief as she raises in the present petition. After conducting a plenary hearing, the court denied the petition for want of substantive merit. Petitioner appealed this denial to the Supreme Court of Virginia, which denied the appeal on November 7, 1995.

Petitioner argues that her attorney at trial, the late Mr. Ed Jasie, was incompetent because he failed to pursue obvious avenues of investigation that would have uncovered factual defenses to the charge of first degree murder or, at the very least, evidence in mitigation of the offense. Specifically, petitioner posits that, without first exploring all possible defenses, Mr. Jasie presumptively decided to pursue a defense of temporary insanity. Petitioner contends that, although a decision to forego certain avenues of defense in favor of another is not *per se* ineffective assistance of counsel, the tenuousness of a plea of temporary insanity, when considered in combination with the information in Mr. Jasie's possession at the outset of his representation of petitioner, rendered such a hasty decision deficient under the Sixth Amendment of the United States Constitution. Petitioner also contends that her attorney was ineffective in failing to present character witnesses on her behalf at trial.

Petitioner alleges that the events leading to her conviction were as follows. Sometime in the middle of 1988, she and her daughter Candace took up residence with Gary Kinder and his daughter Audra. Audra's biological mother was Tammy Hobbs ["Ms. Hobbs"], who had begun living separate from Mr. Kinder in May of 1988. On February 3, 1989, Ms. Hobbs picked Audra up at approximately 11:00 a.m. for a scheduled visitation. Audra had just celebrated her third birthday. Later on that same day, Ms. Hobbs took Audra to the emergency room at the Giles Memorial Hospital. After the visit to the hospital, petitioner and Mr. Kinder picked up Audra, who was unusually quiet and sleepy. On the following morning, Mr. Kinder left for work at approximately 9:00 a.m. Petitioner got out of bed as soon as Mr. Kinder departed, changed Audra's clothes and went to the

kitchen to heat some water. While in the kitchen, she heard a "thump." She went to the living room to find Audra lying on the floor. Petitioner proceeded to shake Audra in an effort to revive her. Immediately thereafter, she used the telephone to call for an emergency rescue squad and to notify Mr. Kinder of his daughter's condition. Mr. Kinder and the rescue squad arrived within minutes, and an ambulance rushed Audra to Giles Memorial Hospital. Soon thereafter, Audra was transported to Roanoke Memorial Hospital, where she died of severe head trauma on the following day.

At petitioner's trial, the prosecution presented a great deal of testimony and evidence discrediting this version of events and calling into question the veracity of petitioner. Mr. Kinder testified on direct examination that, when he had initially asked petitioner about the events which transpired between his departure for work and his return, she indicated that Audra must have fallen and struck her head. He further stated that, when he asked her a week later, petitioner asked him if he would believe that Audra had fallen from the porch. Mr. Kinder also testified that, prior to his daughter's death, he had had several arguments with petitioner about his preference for spending time with Audra rather than petitioner. On cross-examination, Mr. Kinder represented that his daughter had made several complaints to various people that Ms. Hobbs, her biological mother, had been hurting her. He also indicated that there was some tension between petitioner and Ms. Hobbs and that this tension had, at one time, erupted into a physical altercation of some sort. According to Mr. Kinder's testimony, Ms. Hobbs had also made a complaint to Social Services about petitioner's physical abuse of Audra.

The prosecution also called Dr. Thomas Kayrous as a witness. Dr. Kayrous, who was Audra's treating physician at Roanoke Memorial Hospital, testified that, after he had first ascertained the severity of Audra's injuries, he informed Mr. Kinder and petitioner of his findings. Dr. Kayrous stated that petitioner appeared stoic with "no outward emotional concern," and that she related to

him her version of events, as set forth *supra,* with the sole difference being that she found Audra on the threshold of the door. Dr. Kayrous, as an expert witness, opined that Audra could not have sustained her fatal injury, a subdural hematoma, in the type of mishap suggested by petitioner's version of events. Dr. Kayrous further testified that the injury was likely caused by the administration by a blunt object of some sort and that unconsciousness would have resulted immediately.

The prosecution next called M.A. Adams, a member of the rescue squad which responded to petitioner's phone call on the morning of February 4, 1989. Mr. Adams testified that, when the rescue squad arrived at the scene, petitioner seemed stoic and unemotional. He further averred that, when he inquired as to the cause of Audra's injury, petitioner informed him that she had seen Audra fall and hit her head on the door.

The prosecution next called Dr. David Oxley, the expert in forensic pathology who performed the autopsy on Audra at 10:45 a.m. on February 6, 1989. Dr. Oxley indicated that, when he examined the body, he found a brownish bruise over Audra's right eyebrow, a small bruise on the right side of her nose, a bruise on the left upper chest, bruises on the upper part of the right arm, a scrape on the left arm, a "crescent shaped greenish bruise on the back of her left buttock," a bluish contusion on the back of her upper right leg and a bruise on the back of the right forearm. Dr. Oxley further testified that he located a hemorrhage in the area of the abdomen, a fracture of the skull, a fracture of the bone in the left upper arm and a fracture to a bone in the right forearm. He approximated that the fractures were "somewhere between 24 and 48 hours old." Dr. Oxley confirmed Dr. Kayrous' findings regarding the blow to Audra's head and postulated that the injury to the abdomen stemmed from a blow or kick to it in a relaxed position. He further opined that the skull fracture could not have resulted from a fall to the floor by a child of only thirty-six inches in height and that the fractures to the arm were unlikely to have occurred in the same fall. On cross-examination, he con-

ceded that certain of the injuries, the surface bruises and the hemorrhaging in the abdomen, could have occurred as many as fifty-two hours before Audra's death at approximately 6:00 p.m. on February 5, 1989. Dr. Oxley stated that a severe shaking of Audra could have aggravated a previous skull fracture.

The prosecution next called Linda Johnson, an employee of the Giles County Department of Social Services, as a witness. Linda Johnson testified that she interviewed petitioner at Roanoke Memorial Hospital and that petitioner had, with very little emotion, related a version of events similar to the one set forth in her present petition. According to Ms. Johnson, petitioner also indicated that she had discovered Audra lying on her back near the front door, which was open, with her feet pointing toward the living room. Ms. Johnson further stated that petitioner had expressed extreme distaste for Ms. Hobbs during this interview.

Sharon Lowery, Mr. Kinder's sister, testified next for the prosecution. She averred that, around Christmas, 1988, petitioner began to express dissatisfaction with Audra because she was wetting the bed and because "she looked so much like her [biological] mother." Ms. Lowery also indicated that petitioner had relayed statements by Audra that her mother was sexually abusing her. She further testified that she spoke to petitioner the night before the injury to Audra and that petitioner had informed her of Ms. Hobbs's allegation of child abuse and expressed a fear that she would lose her own daughter as a result. Ms. Lowery also related that petitioner had indicated an intention "to get Tammy [Hobbs] for this." She further testified that, when she spoke to petitioner the following day after the accident, petitioner indicated that Audra had fallen off a stool between the living room and the kitchen and that, when she spoke to her again, petitioner suggested that Audra had fallen off a specific chair in the living room. On cross-examination, Ms. Lowery went into greater detail about what petitioner had said about her suspicions regarding the sexual abuse to which Audra had been subjected by Ms. Hobbs.

Finally, the prosecution called Gary Price, who was the officer who investigated Audra's death. He related that, when he interviewed petitioner about the sequence of events leading to Audra's injuries, petitioner told him that she had found Audra near the front door. He also testified that, on the following day, when he asked petitioner to place a doll in the position where she found Audra, petitioner placed the doll in a position consistent with her story from the previous day. Officer Price related that, when asked to stand where she was when she heard Audra fall, petitioner stood near the entrance to her bedroom on the opposite side of the kitchen from the living room. The prosecution then rested.

In response to the prosecution's case-in-chief, Mr. Jasie first called petitioner to testify on her own behalf. Petitioner admitted on the stand that she could remember very little about the events of February 4, 1989, from the time Mr. Kinder left for work until she was in the living room with Audra, who was then unconscious. According to petitioner, she could somewhat remember shaking Audra and had some memory of two "thumps." Petitioner further related to the jury that, prior to February 4, 1989, she had been experiencing great concern for Audra's welfare because Audra had reported that her biological mother was abusing her. Petitioner also described several episodes in which she had had immobilizing dreams about Ms. Hobbs and Audra. She conceded on cross-examination that she may have committed the acts leading to Audra's demise.

Mr. Jasie next called two psychiatrists who were involved in testing or treating petitioner after Audra's death. Dr. Carl E. McGraw testified that petitioner "had a strong psychotic potential, that she was not put together very well and under the right kind of circumstances she would be psychotic, that means out of contact with reality, confused." Mr. Jasie and the prosecution then engaged in a lengthy voir dire of Dr. Morgan Scott to determine the permissible scope of his testimony and the admissibility of a video tape depicting his hypnotization of petitioner with the aid of sodium amytal. The trial court excluded the tape but permitted Dr. Scott to

express his opinion of petitioner's psychological stability as a result of his observation of her while under hypnosis. Dr. Scott testified that he believed petitioner had suffered a brief reactive psychosis on February 4, 1989, and that this psychotic episode had led to Audra's death. After the defense rested, the prosecution called Dr. Dennis Cropper, a forensic psychiatrist, who opined that petitioner had not suffered a psychotic episode.

In light of the evidence presented by the prosecution in petitioner's case, there can be little dispute that Mr. Jasie had serious obstacles to overcome in mounting a factual defense to a charge of first degree murder. Before Mr. Jasie's retention as petitioner's attorney, petitioner had proffered no fewer than four different versions of what happened on the morning of Audra's injuries. Moreover, the physical evidence suggested, if not conclusively showed, that petitioner had committed acts leading to Audra's death.

Notwithstanding these hurdles, petitioner argues that information in her attorney's possession should have led him to evidence in her favor on the issue of guilt and in mitigation of the offense and that he should have pursued these avenues of defense before resorting to the defense of temporary insanity. She first points to the medical examiner's report, which indicated that there was a pain reliever in Audra's blood at the time of death, that there were bruises of various ages on Audra's body, that the biological mother had filed a report with the police department against petitioner and Mr. Kinder for child abuse and that the fractures to Audra's arms were slightly older than the fatal injury to the head. Petitioner next points to a police report indicating that Audra may have been sick for awhile before her death and that she had had as many as four visits to the emergency room before her death, including one on the previous day. Although petitioner argues that the information in Mr. Jasie's possession should have been a mere springboard to additional exculpatory evidence, she cites no other evidentiary support for her apparent suggestion that Audra may have been the subject of physical and sexual abuse by Mr. Kinder or Ms. Hobbs and that this abuse contributed to Audra's demise. Petitioner also contends that Mr. Jasie's failure to present character witnesses at the criminal trial amounted to constitutionally deficient representation.

As is required before proceeding with a federal petition for writ of habeas corpus, petitioner first presented these same arguments to the state judicial system in a collateral attack on her conviction and sentence. After reviewing the evidence and hearing testimony from petitioner, as well as oral argument from her attorney and the attorney for the respondent, the judge presiding over the proceeding in the Circuit Court of Giles County found as follows:

Well, the Court remembers the case very well. I've forgotten how many days it took to try it, but it was a hard fought case, as all criminal cases involving Mr. Jasie were hard fought. He was a highly skilled, dedicated and tenacious defense attorney. . . . I know not what other defense he could have made on behalf of his client other than the one he made of temporary insanity, considering the number of different statements she had given. He vigorously presented the testimony of Dr. Scott. He had a video tape while the defendant was under what's called truth serum, very vivid tape that I did not permit the jury after viewing the same *in camera*, but I did permit Dr. Scott, if I remember correctly, to state from the results of the so-called truth serum that he had an opinion that she was temporarily insane. But in any event, I cannot think that the petitioner has approached the burden established by the *Strickland [v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052, 2055–56, 80 L.Ed.2d 674 (1984) ] case to show that, first of all, that the acts of the defense counsel were ineffective. And secondly, by no means is there any showing that even if they were, and I do not find for a second that they were, that the result would have been different, and I feel quite comfortable in denying your motion and petition.

■■■ Prior to the Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"], Pub.L. 104–132, 110 Stat. 1214, these broad conclusions by a state court regarding the substantive merit of petitioner's argu-

ments would have warranted little, if any, deference from a federal court. *See Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). However, pursuant to 28 U.S.C. 2254(d), as amended by the AEDPA on April 24, 1996:

[a]n application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in state Court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Although several federal appellate courts have held that the amendments effected by the AEDPA should not be applied retroactively, *see e.g. Boria v. Keane*, 90 F.3d 36, 37–38 (2nd Cir.1996); *Edens v. Hannigan*, 87 F.3d 1109, 1111, n. 1 (10th Cir.1996), the Court of Appeals for the Fourth Circuit has not spoken on this issue, and I find myself in agreement with the reasoning of *Lindh v. Murphy*, 96 F.3d 856 (7th Cir.1996), and *Drinkard v. Johnson*, 97 F.3d 751 (5th Cir. 1996). Citing *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Courts in both of these cases held that the new language of § 2254(d) should be applied to all federal petitions regardless of whether the action was pending at the time of the enactment of the AEDPA or the underlying events or proceedings in state court occurred before the enactment of the AEDPA. In *Lindh*, the Court held that "§ 2254(d) does not attach new legal consequences to the filing of petitions for habeas corpus, although other parts of the [AEDPA] may do this." 96 F.3d at 856. The Court reasoned that § 2254(d), as amended, merely "affects the relation be-

tween federal and state courts, rather than affecting the details of litigation," *Id.,* and that the amendments to § 2254(d) do not "'impair rights a party possessed when he acted, increase a party's liability for past conduct or impose new duties with respect to transactions already completed.'" *Id.* at 867, *quoting Landgraf,* at ——, 114 S.Ct. at 1505. The Court in *Drinkard* reached the same conclusion upon substantially the same reasoning. 97 F.3d at 751. Accordingly, I am of the opinion that the § 2254(d), as amended by the AEDPA, must guide my decision in the present case.[1]

■ Applying the language of § 2254(d)(1) to the present case, I find that the state court's decision regarding the merit of petitioner's petition was not "contrary to" or "an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." The Sixth and Fourteenth Amendments protect a criminal defendant's right to the effective assistance of counsel at trial. To demonstrate that this right has been denied, a petitioner must satisfy the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052, 2055–56, 80 L.Ed.2d 674 (1984). First, the petitioner must show that her counsel's representation fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 2064–65. In determining whether petitioner has made this showing, a reviewing court must give great deference to counsel's tactical decisions because there is a strong presumption that counsel's conduct was within the wide range of objectively reasonable assistance. *Id.* at 688–89, 104 S.Ct. at 2064–65. Second, the petitioner also must demonstrate prejudice to her defense. She must show that, but for counsel's errors, there was a reasonable probability that the result of the trial would have been different. *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is one which undermines confidence in the outcome of the trial. *Id.*

In this case, the transcript of the plenary hearing from the *habeas* proceedings held in

---

**1.** Although respondent has not relied upon the AEDPA in addressing petitioner's present grounds for relief, the state need not invoke the new provisions of § 2254 for them to be applicable. *Hogan v. Hanks,* 97 F.3d 189 (7th Cir.1996).

the Circuit Court of Giles County discloses that the state court used the proper federal standard for a claim of ineffective assistance of counsel under *Strickland, supra.* Moreover, the state court's application of this standard to the facts before it was clearly reasonable. As discussed *supra*, petitioner had related different versions of events on different occasions, and the forensic evidence strongly suggested her involvement in the injuries leading to Audra's death. Not only did a theory of temporary insanity help to explain the inconsistencies in petitioner's prior statements, but two trained psychiatrists were able to corroborate this theory. Although petitioner now argues that additional investigation would have yielded more evidence in support of a theory that Ms. Hobbs or Mr. Kinder was somehow involved in Audra's death, the evidence cited by petitioner is far from conclusive, and the question of Ms. Hobbs' possible involvement in Audra's injuries was clearly before the jury. As for petitioner's argument that the evidence to which she cites might have undercut the jury's implicit finding of pre-meditation or that the presentation of character witnesses would have aided in this same cause, the state court was, in my view, reasonably justified in concluding that this evidence would have had no such effect. Accordingly, I shall grant the respondent's motion to dismiss and deny relief as to the present petition for writ of habeas corpus.

Petitioner is advised that she may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of the Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5) or 4(a)(6).

The clerk of the Court is directed to send certified copies of this Memorandum Opinion and accompanying Order to petitioner and to counsel of record for the respondents.